IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | The Honorable Liam O'Grady |
| ) | |
| v. ) | 1:12 CR 3 |
| ) | |
| KIM DOTCOM, et al. ) | Hearing: April 13, 2012 |
| Defendants. ) | 10:00 a.m. |

**REBUTTAL MEMORANDUM OF LAW IN FURTHER SUPPORT OF
EMERGENCY MOTION FOR PROTECTIVE ORDER BY NON-PARTY
<u>CARPATHIA HOSTING, INC.</u>**

Four separate parties have filed four very different responses to Carpathia's motion for a protective order: the United States government, Megaupload ("Mega") (the main corporate defendant in this case),[1] the MPAA (which represents the interests of those who claim their copyrighted works were being infringed), and the EFF (which formally represents a user who wants his data back).[2] Mega and the EFF support Carpathia's motion. The MPAA takes no position on whether the servers should be reprovisioned or preserved, just so long as they are not transferred to Mega without appropriate restrictions. Only the government believes no court action is necessary. But the four responses taken together make clear that Carpathia requires relief. Carpathia has been put in an untenable position chiefly as a result of the criminal case, the government's chosen manner and method of executing the search warrant, Mega's alleged misconduct, and the fact that neither the MPAA nor the government trust that Mega will behave appropriately if given unfettered access to the data. Unless this Court intervenes to resolve these issues, Carpathia will continue to have to balance conflicting demands from criminal defendants,

---

[1] While Mega has styled its brief as a "Proposed Response" contingent on this Court's granting of its attorneys' motion to make a limited appearance, Carpathia, in this reply, assumes that the Court will consider Mega's filing in fashioning an appropriate protective order, though Carpathia takes no position on whether Mega's attorneys' motion should be granted.

[2] The abbreviations used herein conform to those used in Carpathia's Memorandum of Law in Support Emergency Motion for Protective Order.

civil litigants, consumers, and the government, without having actual possession and control of the data that is subject to the dispute – just the physical hardware on which that data resides. This Court undoubtedly has the power to issue a protective order under Fed. R. Crim. P. 16(d) to resolve the handling of evidence in a criminal case and should do so under these circumstances. Additionally, even if some portion of the concerns raised regarding data preservation are collateral to this proceeding, this Court has ancillary jurisdiction to resolve these collateral issues because they touch on matters significantly related to the criminal case. Surely the Court, and not Carpathia, is best positioned to weigh the connecting concerns expressed by the various parties and fashion the appropriate result.

I.  **FACTUAL BACKGROUND**

There can be no real dispute that <u>at least some</u> of the data on the servers at issue is relevant, material, and possibly even critical evidence in this criminal case. Indeed, Mega argues that it is the "vast majority of the evidentiary record" and that the entirety of the data must be preserved. Mega Br. at 9. The government originally believed that all of the data was critical and thus obtained a search warrant to seize <u>all</u> of the Mega Servers located in Ashburn, Virginia, although when executing the warrant, it chose to take only forensic images of selected servers.[3] Although Carpathia subsequently provided Mega with access to image some of the Mega Servers, as detailed in Mega's response, only two were imaged. Mega Br. at 5-6 (stating that KPMG made copies of two servers). The fact that some minor imaging has occurred does not resolve the issue because the overwhelming majority of the data on the Mega Servers has not yet been copied.[4] Moreover, Carpathia's motion is not limited to the few servers for which forensic

---

[3] Carpathia has not attached the warrant because it appears to continue to be under seal. The Government, however, has made the existence of the warrant public by virtue of filing its January 27, 2012 letter publicly with this Court. (Dkt. 32).

[4] The government's inventory of imaged servers may be helpful in assisting the Court in its disposition of the matter.

images have already been made. Once identified, Carpathia can likely reprovision those servers immediately. But for the well over 1,000 uncopied servers that Carpathia is storing only because of the indictment – the issue still needs to be resolved.

As to the past costs Carpathia incurred and the future costs from which Carpathia is seeking relief, the $9,000 per day expense ended on April 6. Carpathia then incurred approximately $65,000 in expenses to have the servers safely transferred to one of its facilities.[5] The additional expenses for which Carpathia now seeks reimbursement are the cash expenses for rent of the leased space allocated to the storage of servers in the Carpathia climate-controlled datacenter, as well as the book value of the equipment that is unavailable for revenue-generating uses.[6] As Carpathia is in the business of renting space in its datacenter to clients, the storage of over one thousand servers is not trivial and consumes resources that otherwise would be available to generate revenue. The government is dismissive of the notion of Carpathia seeking reimbursement for the consumption of internal resources, but it is the equivalent of forcing Extra Space Storage, Inc. to devote 37 of its $1,000 per month rental units to store the defendants' evidence at no charge.[7] Both Carpathia and the storage facility count on the revenue from the leasable space to cover costs of operations.

## II. ARGUMENT

### A. This Court Has the Power to Enter an Order Governing the Handling of Evidence in a Criminal Case

The government sets forth an exceptionally narrow view of this Court's jurisdiction, arguing that the Court does not have the power to enter an order regarding the handling of

---

[5] Well over half of these expenses are out-of-pocket (rent, shipping company charges, airfare, etc); the remainder is made up of Carpathia employees' time taken away from their duties to assist in the movement of the servers.
[6] Carpathia allocates the cash expenses associated with data center leases to each of its customers, as is common practice in the hosting industry.
[7] Moreover, as discussed *infra*, compensation for a third party's use of internal resources is supported by caselaw. *See, e.g., U.S. v CBS Inc., et al*, 103 F.R.D. 365 (C.D. Cal. 1994) (allowing reimbursement for internal personnel's time spent on non-party movie studios' document production).

evidence that a criminal defendant has claimed is central to its case pending before the Court. Federal Rule of Criminal Procedure 16(d)(1), however, provides this Court with broad powers to enter a protective order with respect to evidence in a criminal case – "<u>At any time</u> the court may … grant other appropriate relief." The government's attempts to distinguish *United States v. Salad*, 779 F. Supp. 2d 503 (E.D. Va. 2011), to deprive this Court of jurisdiction over matters critical to this criminal case, are unavailing. The government contends that *Salad* is inapposite because there the defendant initiated the motion, whereas here, the aggrieved third party, Carpathia, seeks the Court's intervention. But the government fails to point to anything in Rule 16's text, or in case law, to suggest that a third party may not seek a post-indictment protective order, or that a third party may not ask the Court to adjudicate a disagreement between the government and a criminal defendant regarding how evidence in its possession should be handled. Moreover, with Mega's filing of its response to Carpathia's motion, it is clear that, as in *Salad*, the defendant is indeed seeking preservation of the evidence at issue. Finally, in *Salad* itself, the Court's analysis and rationale did not hinge on who sought the request, instead focusing on the fact that it was well within the Court's inherent power to resolve preservation issues relating to evidence in a case before it, regardless by whom the motion was made.

     Not only is much, if not all, of the data that resides on the Mega Servers likely relevant to the pending criminal case, and thus within the core of this Court's jurisdiction, but to the extent that non-parties have professed an interest in the data, this Court has ancillary jurisdiction to enter the type of order Carpathia has requested. The fact that discovery has not yet officially started is of no moment because an indictment has been issued, after which the court can issue a protective order at *any time*. See Fed. R. Crim. P 16(d)(1) ("at <u>any time</u> the court may, for good cause, deny, restrict, or defer discovery or inspection, <u>or grant other appropriate relief</u>.")

4

(emphasis added). The proper disposition of the entirety of evidence, even to the extent it affects possible future or existing civil proceedings, is certainly within the scope of this Court's ancillary jurisdiction. *See United States v. Mitchell*, 683 F.Supp.2d 427, 429 (E.D.Va. 2010) ("Ancillary jurisdiction arises when a district court 'acquires jurisdiction of a case or controversy in its entirety, and, as an incident to the full disposition of the matter, may hear collateral proceedings when necessary to allow it to vindicate its role as a tribunal." (*quoting* 13 Charles Alan Wright, Arthur R. Miller, Edward H. Cooper & Richard D. Freer, *Federal Prac. & Pro.* § 3523.2, at 213 (3d ed. 2008)). Indeed, if Carpathia had filed a separate civil interpleader action, or a declaratory judgment action as the government suggested, it would likely be referred back to this Court, if not stayed entirely. *See* Fed. R. Civ. P. 42.

**B.      Neither the Government nor the MPAA's Response Provide a Basis for Restricting the Transfer of the Servers to Another Party**

Both the government and the MPAA raise concerns over transferring the servers to the defendants – mainly that such transfer could enable Mega to move the servers out of this Court's jurisdiction and resume its prior operations or conduct illegal activity. Although Carpathia understands the concerns with returning allegedly infringing materials to an accused copyright infringer, Carpathia should not be forced to act as Mega's gatekeeper. To the contrary, this Court, as it does in many criminal cases, has the power to determine the contours of what access defendants should have to evidence, and who should have to pay for that access. Unlike Carpathia, this Court has the power and authority to impose whatever restrictions and protections it deems appropriate on defendants or the government, including requiring the government to take possession of the servers, or allowing the transfer of the ownership of the servers to Mega, but requiring Mega to store the servers within the Court's jurisdiction and to only use them for

approved purposes.[8]  *See* Fed. R. Crim. P 16(d)(1).  Thus, such concerns support, rather than refute, the need for this Court to issue a protective order.

> **1. Transferring the Servers to Mega or to the Government Would Not Constitute Copyright Infringement**

The MPAA's copyright concerns regarding transfer of the servers back to defendants for use in preparing their defense in the criminal case are overblown.[9]  First, allowing an owner to reclaim its data is not a "transfer" that implicates a copyright owner's distribution right.  The MPAA contends that transfer of the physical hardware – the servers – to Mega (the entity through which the data was originally uploaded to the servers and who controlled the data) could in some way constitute an illegal distribution of its member studios' copyrighted works.  (*See* MPAA Br. at 4-5.)  Carpathia does not want the studios' copyrighted works to be infringed.  But Carpathia does not control or even have access to the data on the servers, and thus cannot transfer or sell that data to anyone, even if it so desired.[10]  Instead, Carpathia is proposing to transfer ownership of the servers themselves; the data is already owned by Mega.  No transfer of ownership or control of any purported "copies" has been proposed.  A "distribution" on the other hand, "must involve a 'sale or other transfer of ownership' or a 'rental, lease, or lending' of a copy of the work." *Atlantic Record Corp. v. Howell*, 554 F. Supp.2d 976, 985 (D. Ariz. 2008); *see* 2 David Nimmer & Melville B. Nimmer, Nimmer on Copyright § 8.11[A], at 8-149 (2007).  Transferring the <u>servers</u>, which already contain Mega's data, would not result in dissemination because the works would not be transferred to anyone.  Instead, Carpathia would only be allowing a data owner to access its data, which is not a distribution under the Copyright Act. *Id.*

---

[8] Based on Mega's response brief, it appears that Mega is agreeable to restrictions and has made this known to the Government.  *See* Mega Br. at n. 3 and Exhibit D.

[9] The MPAA has no objection to the servers being transferred to the Government.  MPAA Br. at 5.

[10] The only alternative for providing Mega with access to the servers would be to allow Mega to create their own images, a procedure which, given the statements in Mega's brief, would not be as cost effective as simply purchasing the servers from Carpathia.  Mega Br. at 6, n. 2 (providing an estimate that it would cost $7.5 million to image the data, versus purchasing the servers from Carpathia for their book value of $1,250,000).

Second, the transfer of servers which purportedly contain copyrighted works to a criminal defendant to prepare their defense would not violate the copyright owner's distribution right. Such a transfer is either entirely protected by fair use under 17 U.S.C. § 107 or by the United States Constitution. *See Kulik Photography v. J. Cochran*, 975 F. Supp. 812, 814 (E.D. Va. 1997) (holding that defendant's use of copyrighted photograph during a televised closing argument was not copyright infringement and stating that "to permit otherwise would permit the copyright laws to trump the constitutional rights of a criminal defendant."); *Religious Technology Center v. Wollersheim*, 971 F.2d 364, 367 (9th Cir 1992) (copying and distributing copyright materials to a witness to prepare testimony is non-infringing "fair use" under 17 U.S.C. § 107).[11] Thus, if evidence on the Mega Servers is relevant to Mega's defense of the criminal copyright charges, *inter alia*, the transfer of copyrighted works in order to aid Mega in that defense cannot be actionable and should not be enjoined.[12]

The Court may further explore the validity of the MPAA's concern about the distribution of specific materials at the upcoming hearing and restrict the defendants' access to these materials accordingly, if it believes the MPAA's concerns are valid.

### 2. By Attempting to Restrict Transfer of the Servers, the Government is in Constructive Control of the Servers

The government, while stating that it has no interest in the data, clearly has such an interest. By objecting to Carpathia's proposed transfer of the Mega Servers, the government is acting inconsistently with its January 27, 2012, letter in which it stated:

---

[11] *See also Jartech, Inc. v. Clancy*, 666 F.2d 403, 406-07 (9th Cir. 1982) (copying of film to be used as evidence in judicial proceeding was fair use).
[12] Furthermore, the MPAA does not identify a single location where a specific infringing work can be found on the Mega Servers; only that their members "are certain to own the copyrights in a substantial percentage of the infringing video files stored on Carpathia's 25,000 computer hard drives leased by Megaupload." (MPAA Brief at 2). Page 5 of the MPAA response also incorrectly refers to 25,000 servers. This case involves 1,103 servers containing more than 25 Petabytes of data.

> The Mega Servers are not in the actual or constructive custody or control of the United States, but remain at the premises controlled by, and currently under the control of, Carpathia and Cogent. Should the defendants wish to obtain independent access to the Mega Servers, or coordinate third-party access to data housed on Mega Servers, that issue must be resolved directly with Cogent or Carpathia. (Dkt 32.)

Given that the data on the servers already belongs to Mega, and not Carpathia, Mega and Carpathia reached an agreement for the sale of the physical servers to Mega—a much less expensive alternative than Mega making its own image of the servers. (Mega Br. at 6, n. 2). The government objected to that sale, apparently for the reasons described in its response brief:

> The government shares these concerns, and is additionally concerned because it has not seen any detailed plans for appropriately transferring the Carpathia Servers to an entity that demonstrates reasonable and untainted resources for that purpose, provides sufficient safeguards regarding access, successfully deals with the specific concerns of victims, and deals appropriately with the contraband and other illegitimate files on the Carpathia Servers. (Govt Br. at n. 3).

But Carpathia should not be required to negotiate with Mega on the government's behalf, especially when Carpathia does not and never had control over or access to the data residing on the servers. If restrictive provisions are appropriate and required before Mega can have access to the data, the government should negotiate those provisions directly with Mega, or this Court should impose such provisions. By claiming that the disposition of the servers is a private civil matter, and then objecting to the parties' proposed solution because it does not address the government's concerns, the government is effectively asserting constructive control over the servers. Carpathia has no objection to such control, provided it is relieved of the burdens of maintaining and storing the servers without compensation.

The government also makes vague allegations (contained in a footnote) that child pornography may be present on one or more of the servers as a reason to prevent their transfer.[13] The government, however, has provided no information indicating which of the 1,103 servers

---

[13] *See* Govt Br. at 4-5, n. 3.

8

containing over 25 petabytes of data contains the alleged child pornography. Setting aside the fact that Carpathia itself cannot access the data, searching for a single file in a volume of data large enough to represent half of all of humankind's written works without any guidance as to its location, would make looking for an actual needle in a haystack seem trivial. If the government's concern is sufficiently serious to raise the issue before this Court, the government should reclaim the servers and take possession of the contraband itself.

### 3. The Servers Must Be Transferred to Another Party to Enable the Return of Material to Users

The EFF, on behalf of Kyle Goodwin, has filed a response asking that this Court order a mechanism for Mega users who have legitimate content on the servers to be allowed to demonstrate that they lawfully own such content and be allowed to retrieve it. The MPAA objects to the procedures Goodwin sets forth, but believes some method for returning content to users through a receivership may be appropriate. (MPAA Brief at 6.) Regardless of which party is correct, the servers must be transferred to a third party with the authority and ability to access the data in order to return any data to any user (or to the MPAA). Carpathia cannot provide access to the files on the Mega Servers on its own. Only two parties are currently able to access the data contained on them: Mega (because it controls the data) and the government (because it had authority to seize all of the servers and bypass any password control to get at the data). As such, to effect any relief, the servers must be transferred from Carpathia to one of those parties.

### C. Some Party with an Interest in Continued Preservation of these Materials Should Bear the Cost of Preservation, Not Carpathia.

The government stands alone in objecting to Carpathia's request for compensation. Mega and the EFF are supportive of Carpathia's Motion. (EFF Br. at 2; Mega Br. at 13). And at least one member of the MPAA has sought compensation in a similar situation, where several

9

movie studios were in possession of evidence related to a litigation in which they were not parties. *See United States v. CBS, Inc., et al.*, 103 F.R.D. 365 (C.D. Cal. 1994) (granting in part non-party movie studios' motion to recover $2,000,000 cost of responding to discovery subpoenas, including costs for personnel for time spent on document production, equipment, supplies, transportation, alterations of facilities to provide work space for the document production, and accountants' fees for time spent responding to subpoenas).

As the briefs on this issue make clear, Carpathia is in no position to decide whether to destroy or keep the data without guidance from this Court. Defendants' claims are sufficiently reasonable that without a court order, it would be imprudent for Carpathia to simply ignore them and reprovision the servers. And while the government claims its sampling is sufficient and no further data need be preserved, other parties have claimed that *all* of the data is necessary – Mega for its defense, EFF for the return of data to innocent users, and MPAA for use in future litigation.[14] At a minimum, Carpathia believes that the Court alone should make the determination whether the servers can be reprovisioned, and how, if at all, to provide relief to innocent owners whose materials are no longer available to them.

## CONCLUSION

Non-party Carpathia should not be in the position of having to determine the fate of data it does not control, merely because it resides on physical hardware it owns. Because the MPAA and the government do not trust Mega, they want Carpathia to stay in the middle of these disputes at significant cost to Carpathia. The government, the MPAA, defendants, and Mega

---

[14] As stated in Carpathia's opening brief, initially the MPAA requested that Carpathia preserve all data on the servers. In conversations with the MPAA's counsel, Carpathia counsel inquired whether the government's sampling of servers would meet the MPAA's needs, and the MPAA thus far has not responded. In its response brief, the MPAA now says it "take[s] no position on whether the more appropriate disposition now is to allow the servers to be reprovisioned or to require them to be preserved in their current state." MPAA Br. at 6. Carpathia understands that, by this statement, the MPAA withdraws its earlier preservation request.

users all have (or had) some interest in accessing the data.  Indeed, the government previously sought authority from this Court to seize <u>all</u> of the Mega Servers in Virginia, although it chose not to fully exercise that authority.  By contrast, only Carpathia has no interest in the data.  Indeed, it would be equally content to sell the servers to Mega, reprovision them for use by other customers, or sell them on the secondary market.  Accordingly, if the data is to be maintained, the government or one or all of the other parties seeking access to or making use of the data should bear the burden of maintaining the servers.  At a minimum, Carpathia asks this Court to discharge it from the continuing costs associated with the storage of the servers, and from the concomitant obligation to provide ongoing and uncompensated access to the interested parties.

    Respectfully Submitted,

    SNR Denton US LLP

    */s/ Christopher L. Harlow*
    By: Christopher L. Harlow  (Bar No. 74966)
    SNR Denton US LLP
    1301 K Street, NW
    Suite 600, East Tower
    Washington, DC 20005
    (202) 408-6400  Telephone
    (202) 408-6399  Facsimile
    charlow@snrdenton.com

    *Attorneys for Carpathia Hosting, Inc.*

    Marc J. Zwillinger
    Jacob A. Sommer
    ZwillGen PLLC
    1705 N Street, NW
    Washington, DC 20036
    (202) 296-3585

    Robert Huff, Jr.
    ZwillGen PLLC
    300 N LaSalle St., 49th Floor
    Chicago, IL 60654
    *Attorneys for Carpathia Hosting, Inc., Pro Hac Vice*

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 9, 2012 the foregoing was filed and served electronically by the Court's CM/ECF system upon all registered users, as well as by first-class U.S. mail, postage pre-paid, upon the following:

Jay V. Prabhu
Chief, Cybercrime Unit
Assistant United States Attorney
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA 22314

Paul Brinkman
Quinn Emanuel Urquhart & Sullivan LLP
1299 Pennsylvania Ave. NW, Suite 825
Washington, DC 20004
*Counsel to Megaupload Limited and Kim Dotcom*

Ira Rothken
Rothken Law Firm
3 Hamilton Landing, Suite 280
Novato, CA 94949
*Counsel to Megaupload Limited and Kim Dotcom*

Cindy A. Cohn
Legal Director and General Counsel
Electronic Frontier Foundation
454 Shotwell Street
San Francisco, CA 94110
*Counsel to Electronic Frontier Foundation*

Stephen Fabrizio
Jenner & Block
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
*Counsel to Motion Picture Association of America*

></br>

                                                  */s/ Christopher L. Harlow*
                                                  Christopher L. Harlow (Bar No. 74966)
                                                  SNR Denton US LLP

1301 K St. NW, Suite 600, East Tower
Washington, DC 20005
(202) 408-6400 Telephone
(202) 408-6399 Facsimile
charlow@snrdenton.com

13