# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. CR 11-00573 JSW |
| v. | **ORDER GRANTING SPECIALLY APPEARING DEFENDANTS' MOTION TO QUASH SERVICE OF INDICTMENT** |
| PANGANG GROUP COMPANY, LTD. PANGANG GROUP STEEL VANADIUM & TITANIUM COMPANY, LTD. PANGANG GROUP TITANIUM INDUSTRY, LTD and PANGANG GROUP INTERNATIONAL ECONOMIC & TRADING COMPANY | |
| Defendants. | |

**INTRODUCTION**

This matter comes before the Court upon consideration of the Motion to Quash Service of the Indictment, filed by specially-appearing defendants, Pangang Group Company, Ltd. ("Pangang Group"), Pangang Group Steel Vanadium & Titanium Company, Ltd. ("PGSVTC"), Pangang Group Titanium Industry, Ltd. ("Titanium"), and Pangang Group International Economic & Trading Company ("PIETC") (collectively, the "Pangang Defendants").

The Court has considered the parties' papers, relevant legal authority, the record in this case, and it has had the benefit of oral argument. The Court HEREBY GRANTS the motion to quash.

//

//

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

## BACKGROUND

This case arises from charges filed on July 27, 2011, against Walter and Christina Liew (the "Liews"). In a criminal complaint, the United States charged the Liews with witness tampering[1] and with making false statements to agents of the United States Government. (*See* Docket No. 1, Criminal Complaint ¶¶ 7-8.) A grand jury indicted the Liews on these charges on August 23, 2011.

On February 7, 2012, a grand jury issued a superseding indictment, naming eight additional defendants, including the Pangang Defendants. The Pangang Defendants are charged with: (1) conspiracy to commit economic espionage, in violation of 18 U.S.C. section 1831(a)(5); (2) conspiracy to commit theft of trade secrets, in violation of 18 U.S.C. section 1832(a)(5); (3) attempted economic espionage, in violation of 18 U.S.C. section 1831(a)(3)-(4). (Docket No. 64, Superseding Indictment, ¶¶ 12-54, 57-58, 90-95.)

The Government alleges that Pangang Group is a state-owned enterprise of the People's Republic of China ("PRC"), which is controlled by the State-Owned Assets Supervision and Administration Commission of the State Council.[2] (Superseding Indictment, ¶¶ 8-9; *see also* Declaration of Andrew Z. Szamosszegi ("Szamossegi Decl."), ¶¶ 15-16, 19-20, Exs. 27, 33; Declaration of Special Agent Katherine Patillo ("Patillo Decl."), Ex. F.)[3] The Government also alleges that the Pangang Group "controlled the following subsidiaries:" PGSVTC, Titanium, and PIETC. (Superseding Indictment ¶ 10.) The Government further alleges that: PGSVTC shared senior management with the Pangang Group; Titanium was owned and controlled by

---

[1] Walter Liew is also a defendant in *E.I. DuPont de Nemours & Co. v. USA Performance Technology, Inc., et al.*, No. 11-CV-1665-JSW (the *"DuPont"* litigation") and the Liews are charged with tampering with witnesses in that case. In the *DuPont* litigation, the plaintiff alleges that the defendants, including Walter Liew, misappropriated trade secret materials providing detailed specifications for the plaintiff's chloride-route titanium dioxide pigment manufacturing process. The Pangang Defendants are alleged to be the intended beneficiaries of the trade secrets at issue in the *Du Pont* litigation.

[2] Pangang Group was formerly named Pangzhihua Iron and Steel (Group) Company. (*See* Declaration of Peter Axelrod ("Axelrod Decl."), Ex. F at 000001.)

[3] The Court addresses the Pangang Defendants' objections to the Szamossegi Declaration in Section A, and it addresses additional evidentiary objections raised at the hearing as necessary in the analysis.

1    both the Pangang Group and PGSVTC; and PIETC was the financing arm of the Pangang

2    Group and was owned and controlled by both the Pangang Group and PGSVTC. (*Id.*) Pan

3    America, Inc. ("Pan America"), is located in East Brunswick, New Jersey, and is owned by

4    Pangang Group, which holds a majority 75% interest, and PIETC, which holds a 25% interest.

5    (Declaration of Wang Qizhi ("Wang Decl."), ¶¶ 2-4.)[4]

6        On November 29, 2011, the Government asked Wang Qizhi ("Mr. Wang"), Pan

7    America's General Manager, if he would accept service of a letter to Pangang Group's

8    chairman and legal representative. (Declaration of George D. Niespolo ("Niespolo Decl."),

9    Ex.1.) In response, Mr. Wang's counsel advised the Government that Mr. Wang and Pan

10    America were not authorized to accept service for any of the Pangang Defendants. (Niespolo

11    Decl., Ex. 1.) Nonetheless, on February 9, 2012, the Government delivered a summons for each

12    of the Pangang Defendants to Brenda Kong, Pan America's officer manager at that time.

13    (Wang Decl. ¶ 17; Axelrod Decl.,

14    ¶ 4, Ex. A.) The Government also sent copies of those four summons via certified mail to Pan

15    America's office in New Jersey. (Axelrod Decl., ¶¶ 3-5, Ex. B.)

16        The Court shall address additional facts in the remainder of this Order.

17                      **ANALYSIS**

18        The Pangang Defendants move to quash service of the summons on the basis that the

19    Government failed to comply with the requirements of Federal Rule of Criminal Procedure 4(c)

20    ("Criminal Rule 4"). The Government agrees that it bears the burden of demonstrating that

21    service was proper. *See, e.g., United States v. Alfred L. Wolff GMBH*, 2011 WL 4471383, at *4,

22    *8 (N.D. Ill. Sept. 26, 2011) ("*Alfred L. Wolff*") (placing burden on government to show it

23    properly effected service).

24    **A.**      **The Pangang Defendants' Objections to the Szamossegi Declaration.**

25        The Pangang Defendants object to Mr. Szamossegi's declaration on the basis that it is

26    improper expert testimony, but they do not contest his qualifications. They also do not suggest

27    Mr. Szamoseggi does not possess "specialized knowledge" that "will assist the trier of fact to

28

---

     [4]      Pan America is not named in the Superseding Indictment.

3

*United States District Court*
For the Northern District of California

1  understand the evidence or to determine a fact in issue..." *See* Fed. R. Evid. 702. Therefore, the

2  Court overrules' the Pangang Defendants' objections to the Szamossegi Declaration on this

3  basis, and it shall not strike the declaration in its entirety.[5]

4        The Pangang Defendants also object to those portions of the Szamossegi Declaration, in

5  which he sets forth opinions about the structure of corporations in the PRC, in general, and

6  which are not directed to the Pangang Defendants specifically, on the basis that this testimony is

7  irrelevant. The Court sustains that objection. *See* Fed. R. Evid. 401. Accordingly, the Court

8  has not considered paragraphs 3-12 or the exhibits referenced in those paragraphs.

9        The Pangang Defendants also object to several exhibits attached to the Szamossegi

10 Declaration on the basis that they are documents in the Chinese language for which no

11 translation is provided. The Court finds sustains the objections to those exhibits. The

12 Government was aware that it would bear the burden of proof on this motion. If it required an

13 extension of time to obtain translations to complete its evidentiary record, it could have asked

14 for one. Accordingly, the Court has not considered page 19 of Exhibit 6. The Court also has

15 not considered Exhibits 15, 21-23, 25, 29, and 31.

16 **B.    The Requirements of Federal Rule of Criminal Procedure 4.**

17        Pursuant to Criminal Rule 4, if a complaint or affidavits filed with a complaint establish

18 "probable cause to believe that an offense has been committed and that the defendant committed

19 it," and at the request of an attorney for the government, a judge may issue a summons instead

20 of a warrant. Fed. R. Crim. P. 4(a). A summons may be served "within the jurisdiction of the

21 United States or anywhere else a federal statute authorizes an arrest." Fed. R. Crim. P. 4(c)(2).

22        Under Criminal Rule 4(c)(3), a summons may be served "on an organization by

23 delivering a copy to an officer, to a managing or general agent, or to another agent appointed or

24 legally authorized to receive service of process" (hereinafter "the delivery requirement"). Fed.

25 R. Crim. P. 4(c)(3)(C). The summons also must be mailed "to the organization's last known

26

27

28    _____

[5]       The Court does not intend this ruling to preclude the Pangang Defendants
from raising a pretrial challenge to the admissibility of this testimony.

4

1  address within the district or to its principal place of business elsewhere in the United States"

2  (hereinafter "the mailing requirement").

3       The Government's primary argument is that it has satisfied the delivery and the mailing

4  requirements, because Pan America was established to be the general agent and the principal

5  place of business in the United States for the Pangang Defendants as a group of companies.

6  (*See, e.g.,* Docket No. 174, Transcript of Proceedings for June 8, 2012 ("6/8/12 Tr.") at 4:8-12,

7  6:2-9; Docket No. 175, Transcript of Proceedings for June 7, 2012 ("6/7/12 Tr.") at 42:22-

8  43:11). In the alternative, it argues that Pan America is each of the Pangang Defendants' alter-

9  ego.

10       The interplay between personal jurisdiction, sufficiency of service, agency, and alter-

11  ego has been addressed frequently in civil cases. *See, e.g,. Bauman v. Daimler Chrysler Corp.*,

12  644 F.3d 909, 920-921 (9th Cir. 2011) (motion to dismiss for lack of personal jurisdiction);

13  *Hickory Travel Systems, Inc. v. TUI A.G.*, 213 F.R.D. 547, 553 (N.D. Cal. 2003) (motion to

14  quash service). However, there appear to be only four criminal cases on point, which will be

15  discussed in more detail later in this Order. Two district courts have granted motions to quash.

16  *Alfred L. Wolff*, 2011 WL 4471383; *United States v. Johnson Matthey PLC*, 2007 WL 2254676

17  (D. Utah Aug. 2, 2007) ("*Johnson Matthey*"). In the other two cases, the district courts denied

18  the motions. *United States v. The Public Warehousing Company*, 2011 WL 1126333 (N.D. Ga.

19  Mar. 28, 2011) ("*Public Warehousing*"); *United States v. Chitron Electronics Co., Ltd.*, 668 F.

20  Supp. 2d 298 (D. Mass. 2009) ("*Chitron Electronics*"). [6]

21      **1.**    **The Delivery Requirement.**

22       To satisfy the delivery requirement, the Government must show it has served a summons

23  on the Pangang Defendants' managing or general agent.[7] The Government's theory of the case

24

25      [6]    The Court did not locate any additional cases resolving the issue, although a
26  motion to dismiss for lack of jurisdiction based on insufficient service currently is pending in
the case of *United States v. Kim Dotcom*, No. 1:12-CR-3 (E.D. Va).

27      [7]    It is undisputed that the Government has not served an officer of any of the
28  Pangang Defendants. It also is undisputed that the Government has not served an agent that
the Pangang Defendants have "appointed or legally authorized to receive service of process."
(*See* Wang Decl., ¶ 17; Niespolo Decl., ¶ 2, Ex. 1.)

*United States District Court*
For the Northern District of California

1    focuses on the Pangang Defendants as a group of companies, and it structured its brief in light

2    of that theory. Thus, it did not clearly outline the independent relationship between Pan

3    America and each of the Pangang Defendants.[8] The flaw in the Government's theory is that it

4    must be able to show general agency as to each particular defendant. *See, e.g., Hickory Travel*,

5    213 F.R.D. at 554. During oral argument and at the Court's request, the Government outlined

6    what it believed was the best evidence supporting its general agency theory as to each of the

7    four Pangang Defendants.

8         The Ninth Circuit has set forth a two part test to determine whether an agency

9    relationship exists between organizations, for example between a foreign parent and a domestic

10   subsidiary. *Bauman*, 644 F.3d at 920-21. First, the court inquires whether the domestic

11   subsidiary functions as the foreign parent's "representative in that it performs services that are

12   sufficiently important to the foreign corporation that if it did not have *a representative* to

13   perform them, the corporation's own officials would undertake to perform substantially similar

14   services." *Id.* (citations omitted and emphasis in original). The "purpose of examining

15   sufficient importance is to determine whether the actions of the subsidiary can be understood as

16   a manifestation of the parent's presence." *Bauman*, 644 F.3d at 921; *see also id.* at 922

17   (sufficient importance test is satisfied if the foreign parent "would perform equivalent services *if*

18   *no agent* were available") (quoting *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 95 (2d

19   Cir. 2000) and adding emphasis).

20        Second, the court inquires whether the foreign defendant exercises a measure of control

21   over the domestic subsidiary. *Id.* at 920.

22            a.    **Pan America and Pangang Group.**

23        In order to show that Pan America performs services for Pangang Group that meet the

24   "sufficient importance" test, the Government relies on letters from Pangang Group's chariman,

25   Fan Zhengwei ("Chairman Fan"), in which he describes Pan America as "our Northern

26

27       [8]    To the extent the Government premised its motion on a theory that each of the four Pangang Defendants should be viewed as one, the Court finds that the Government has not met its burden to show that PGSVTC, Titanium, PIETC and Pangang Group have no

28   independent legal existence from each other. Thus, the Court will not treat them as one entity for purposes of evaluating their relationship with Pan America.

**United States District Court**
For the Northern District of California

1    Hemisphere" head office. (Axelrod Decl., Ex. D at 000005; Axelrod Decl., Ex. F at 000001,

2    000006.) Chairman Fan also states that Pan America "acts as an agency for trade business ...

3    and ... is in the process of setting up a comprehensive marketing system and to develop a

4    stronger business relationship between China and the United States." (*Id.*, Ex. D at 000006,

5    000009, Ex. F at 000006-7, 0000010.) The Government also relies on letters in which Mr.

6    Wang described Pangang Group as the "head office" of Pan America. Mr. Wang also described

7    Pan America as Pangang Group's marketing arm in the Americas and stated that Pan America

8    represents Pangang Group in the Americas. (Patillo Decl., Exs. F, G; *see also, e.g,* Axelrod

9    Decl., Ex. F at 000001.) The record also includes customer declarations, discussed in the

10   following section, which suggest that Pan America has taken over some duties that Pangang

11   Group employees used to perform.

12        In *Baumann*, the plaintiffs brought suit against a German corporation in the United

13   States under the Alien Tort Statute and the Torture Victims Protections Act, based on

14   allegations that one of the defendant's subsidiaries had collaborated with Argentinian security

15   forces to kidnap, detain, torture and kill the plaintiffs or their relative during Argentina's "Dirty

16   War." *Bauman*, 644 F.3d at 911-12. The defendant moved to dismiss for lack of personal

17   jurisdiction, but the plaintiffs argued that it was subject to jurisdiction in the United States

18   based on the contacts of a wholly-owned domestic subsidiary.

19        The Ninth Circuit agreed with the plaintiffs. It found that the subsidiary was the

20   exclusive distributor for the foreign defendant's vehicles in the United States and that "a critical

21   aspect of" the foreign defendant's business operations was to sell its vehicles. The court also

22   noted that the United States market, and California in particular, accounted for a fair percentage

23   of those operations, such that the defendant "simply could not afford to be without a U.S.

24   distribution system." *Id.* at 914, 922. Because the defendant would either have to sell the

25   vehicles itself or establish a new entity to do so, the court concluded that the subsidiary's

26   services were "sufficiently important" to the defendant. *Id.*

27        Neither party suggests that Pangang Group is merely a holding company, such that if it

28   divested itself of Pan America, it could continue to operate as a holding company. *See, e.g.,*

7

*Hickory Travel*, 213 F.R.D. at 544. However, based on the evidence described above, in conjunction with the customer declarations discussed in the following section, the Court finds the Government has shown that the services Pan America performs are integral to Panang Group's core business, such that Pangang Group would perform them itself, if Pan America was not available to perform these services.

Turning to the second element, control, "'[t]o form an agency relationship, both the principal and the agent must manifest assent to the principal's *right to control* the agent.'" *Bauman*, 644 F.3d at 923 (quoting *United States v. Bonds*, 608 F.3d 495, 506 (9th Cir. 2010) and adding emphasis). In *Bauman*, the court found that the control element was satisfied, because the parties' relationship was governed by a "comprehensive written agreement," that established the requirements the domestic subsidiary was required to follow as the defendant's general distributor in the United States. *Id.* at 914-17, 923-24 (noting that under agreement, defendant had "the right to control nearly all aspects of" the subsidiary's operations).

Here, the Government relies primarily on the fact that Mr. Wang and Mr. Zhang entered the United States on L1-A visas. The Government emphasized at oral argument that an L1-A visa is considered an intracompany transfer. *See* 8 C.F.R. § 214.2(l)(1)(i)("An alien transferred to the United States under this nonimmigrant classification is referred to as an intracompany transferee...."). An L1-A visa is available

> [to] an alien who, within three years preceding the time of his application for admission into the United States, has been employed continuously for one year by a firm or corporation or other legal entity or an affiliate or subsidiary thereof and who seeks to enter the United States temporarily in order to continue to render his services to the same employer or a subsidiary or affiliate thereof in a capacity that is managerial, executive or involves specialized knowledge...

8 U.S.C. § 1101(a)(15)(L); 8 C.F.R. § 214.2(l)(1)(ii)(A) (stating that nonimmigrant alien may be employed by a "branch of the same employer or a parent, affiliate, or subsidiary" of the employer).

In order to obtain an L1-A visa, a petitioner must establish, *inter alia*, that "the petitioner and the organization which employed or will employ the alien are qualifying organizations...." 8 C.F.R. § 214.2(l)(3)(i). A "qualifying organization" is defined as "a United

8

States or foreign firm, corporation, or other legal entity which," *inter alia*, "[m]eets exactly one of the qualifying relationships specified in the definitions of a parent, branch, affiliate or subsidiary specified in paragraph (l)(1)(ii) of this section...." *Id.* § 214.2(l)(ii)(G). "Parent" is defined to mean "a firm, corporation or other legal entity which has subsidiaries." *Id.* § 214.2(l)(ii)(I). "Subsidiary" is defined to mean "a firm, corporation, or other legal entity of which a parent owns, directly, or indirectly, more than half of the entity and controls the entity; or owns, directly or indirectly, half of the entity and controls the entity; or owns, directly or indirectly, 50 percent of a 50-50 joint venture and has equal control and veto power over the entity; or owns, directly or indirectly, less than half of the entity, but in fact controls the entity." *Id.* § 214.2(l)(ii)(K).

The Government submits a declaration from Aaron York, who attests that the control described in the regulation "may be de jure [as a matter of law] by reason of ownership of 51 percent or control of voting shares through partial ownership of proxy votes. A petitioning company must disclose all agreements relating to the voting of shares, the distribution of profit, the management and direction of the subsidiary, and any other fact affecting actual control of the entity." (Docket No. 123, Declaration of Aaron York ("York Decl."), ¶¶ 6-7, 9.)[9] It is clear that the Pangang Group was required to establish some measure of control over Pan America to obtain L1-A visas. However, the statute, the regulations, and the York declaration do not establish that the level of control required equates to the level of control necessary to establish an agency relationship. *Compare Bauman*, 644 F.3d at 920 *with* 52 Fed. Reg. 5378-01, 5742, 1987 WL 127799 ("[S]ince the L category was created, Service policy has been based on the common or general meaning and usage of" the terms employer, affiliate or subsidiary, "which imply 'control' by virtue of ownership."). Moreover, the Government has not provided the Court with any authority to support such an interpretation.

The Government also relies on a document entitled "Pan America, Inc. New York Company General Affairs Policies and Procedures," which states that "Pan America, Inc., New

---

[9]    Mr. York is "an Immigration Officer with the Fraud Detection and National Security United with the Center Fraud Detection Operations [*sic*] at the California Service Center." (York Decl., ¶ 1.)

1   York ... has set out the following Policies and Procedures ("hereafter "the P&P")...." (Patillo

2   Decl., Ex. D.)  The document also states that "[t]his P&P basically is in line with the Head

3   office's General Affairs P&P and followed by some minor amendments in order to comply with

4   the common practice of the local business environment." (Patillo Decl., Ex. D at p. 3.)  Pan

5   America is a New Jersey corporation and, thus, this document appears to be a draft.  However,

6   even if the Court were to assume that a similar document was prepared after Pan America was

7   incorporated in New Jersey, the Court finds the document sufficiently distinguishable from the

8   comprehensive agreement discussed in the *Bauman* case, such that it does not support a finding

9   that the Pangang Group had the right to control Pan America's activities or that Pan America

10   assented to that right.  *See Bauman*, 644 F.3d at 915-17 (setting forth terms of agreement).

11      Because the Court finds that the Government has not established that Pangang Group

12   has the requisite control over Pan America, the Court finds that the Government has not

13   established that Pan America acted as Pangang Group's general agent.  Accordingly, as to

14   Pangang Group the Government has not established that it complied with delivery requirement.

15   However, even if the Government had shown that Pan America is Pangang Group's general

16   agent, the Court still would grant the motion to quash service on Pangang Group for the reasons

17   discussed in the remainder of this Order.

18         **b.**    **Pan America and PIETC.**

19      In order to establish that Pan America performs services for PIETC, which satisfy the

20   sufficient importance prong of the general agency test, the Government submits declarations

21   from individuals who worked for customers of PIETC before Pan America was established.

22   (Docket No. 128, Declaration of Bradley Decker ("Decker Decl."); Docket No. 131,

23   Declaration of Laird Walker ("Walker Decl."); Docket No. 135, Declaration of Phil Poce

24   ("Poce Decl."); Docket No. 136, Declaration of Spencer Brog ("Brog Decl.").)

25      These declarations show that, after Pan America was established, some customers

26   continued to negotiate substantive matters regarding their purchases directly with PIETC, or

27   Pangang Group, rather than Pan America.  (Poce Decl., ¶ 3; Brog Decl., ¶ 3.)  The Government

28   acknowledges this fact, but it argues that Pan America took over "back-office" support from

**United States District Court**
For the Northern District of California

10

United States District Court
For the Northern District of California

1    PIETC. It claims that, in that role, Pan America provided the "same services" that PIETC used

2    to provide to its customers. (*See, e.g.*, Decker Decl., ¶¶ 3-4; Walker Decl., ¶ 2; Brog Decl., ¶ 3.)

3    Specifically, Pan America appears to have provided, *inter alia*, "local documentation and

4    information on behalf of Pangang Group," acted as conduit for communications with PIETC or

5    Pangang Group, assisted with "correspondence regarding technical issues and damage claims"

6    and administrative functions, and acted as a conduit for commercial disputes. (Decker Decl, ¶¶

7    3-4; Walker Decl., ¶ 4; Brog Decl., ¶¶ 2-6; *see also* Patillo Decl., ¶¶ 4.d-h, 6, Exs. I-M, V.)

8         PIETC does not suggest that it is merely a holding company, such that if it divested

9    itself of Pan America, it could continue to operate as a holding company. *See, e.g., Hickory*

10   *Travel*, 213 F.R.D. at 544. The Court also notes that, according to the record, the percentage of

11   PIETC's total sales revenue that is accounted for by Pan America's sales revenue varied from

12   0% to 1.1%, between 2008 and 2011. (Document 143-2, Declaration of Yang Fang, ¶ 2.)

13   Although that fact is not dispositive, it is pertinent to a determination of whether Pan America's

14   services meet the "sufficient importance" test. *See Baumann*, 644 F.3d at 922 (noting

15   percentage of foreign defendant's business derived from United States market as fact pertinent

16   to finding of agency); *Chan v. Society Expeditions, Inc.*, 39 F.3d 1398, 1406 (9th Cir. 1994)

17   (remanding to district court for determination on agency, where record did not reveal what

18   percentage of foreign parent's business came from domestic subsidiary).

19        Taking all of this evidence into account, the Court concludes that the Government has

20   put forth sufficient facts to show that the services Pan America performs are integral to PIETC's

21   core business, such that PIETC would perform them itself, as it apparently used to do, if Pan

22   America was not available to perform these services.

23        Turning to the element of control, the Government again relies heavily on the L1-A visa

24   applications. For the reasons set forth above, the Court does not find those applications

25   establish a level of control commensurate with a general agency relationship.

26        The Government also relies on evidence that, after Pangang Group merged into Angang

27   Group, PIETC requested that Pan America merge its offices with Angang Group's United States

28   subsidiary, Angang America, Inc., and that Pan America complied. (Patillo Decl., ¶ 4.m, Ex. 4;

11

**United States District Court**
For the Northern District of California

1    *see also* Declaration of Pasquale Garofalo ("Garofalo Decl."), ¶¶ 1-5, Ex. A.)[10]  It also relies on

2    the fact that several declarants opine that "people in China working on behalf of Pangang Group

3    and PIETC make all of the decisions, and the Pan America representatives serve as clerks to run

4    certain documents through." (*See* Poce Decl., ¶¶ 2-5; *see also* Brog Decl., ¶ 4.)  It also refers to

5    a memorandum, which states that PIETC, *inter alia*, will formulate overall sales strategy,

6    implement and confirm "technology clause [*sic*]," address price administration, and "coordinate

7    internal communications and management of contract relative to production, transportation, and

8    sales activities." (Patillo Decl., Ex. O)  It is evident from this document, that Pan America

9    retains some control over its activities.  For example, "[f]or major, stable clients, negotiation of

10   the contract/agreement clause will be carried out jointly by" PIETC and Pan America.  (*Id.*, Ex.

11   O at p.3.)  Pan America also is responsible for "develop[ing] markets in the America region," is

12   responsible for service on sales in that region, before, during and after a sale, and is responsible

13   for "uniform management of the American region market clientele and other marketing

14   resources." (*Id.*)  Pan America also is entitled to negotiate contracts for new or infrequent

15   clients. (*Id.*)

16        "A person may be an agent although the principal lacks the right to control the full range

17   of the agent's activities." *Bauman*, 644 F.3d at 923.  Although this case does not include the

18   type of comprehensive agreement present in the *Bauman* case, the Court finds the facts are

19   sufficient to show that PIETC retained the right to control Pan America and that Pan America

20   assented to that right.

21        The Court finds that the Government has shown that Pan America acts as PIETC's

22   general agent.  Accordingly, as to PIETC, the Government has met its burden to show it

23   satisfied the delivery requirement.  That does not end the inquiry, because the Court still must

24   find the Government complied with the mailing requirement.

25

26

27        [10]    The facts set forth in Mr. Garofalo's declaration conflict with Mr. Wang's
     attestations that Pan America "leases real estate in its own name, makes its leasing decisions
28   independently of Pangang Group and PIETC, and pays its rent from its own accounts."
     (*Compare* Garofalo Decl., ¶ 5 *with* Wang Decl., ¶ 12.)

**United States District Court**
For the Northern District of California

c.   **Pan America and Titanium.**

In order to show an agency relationship between Pan America and Titanium, the Government relies primarily on evidence that shows when employees of Titanium were detained in the United States, in connection with this investigation, Pangang Group purportedly directed Pan America to assist these employees and to advance legal fees on their behalf. (*See* Patillo Decl., ¶¶ 7, 9, Exs. N, W.) However, unlike in *Bauman*, there are no facts to show that Titanium could not have afforded to carry on its business without Pan America's presence in the United States. Pan America's assistance may have been useful to Titanium. However, "[t]he fact that [a] subsidiary performs a function that" a related entity "finds useful, ... is insufficient to establish agency if" that entity "could carry on its core business in the absence of that subsidiary's work; for agency to exist, the subsidiary's activity must be integral to the parent's business." *Hickory Travel*, 213 F.R.D. at 515. Moreover, there is no evidence in the record that Titanium has any measure of control over Pan America. *See Bauman*, 644 F.3d at 920-21.

The Court finds the Government has not shown that Pan America is Titanium's general agent. Accordingly, as to Titanium, the Government has not established that it complied with the delivery requirement. However, even if the Government had shown that Pan America is Titanium's general agent, the Court still would grant the motion to quash service on Titanium for the reasons discussed in the remainder of this Order.

d.   **Pan America and PGSVTC.**

In order to support its argument that Pan America acts as a general agent for PGSVTC, the Government contends that PGSVTC sets the salaries for Pan America's managerial employees. (*See* Patillo Decl., Ex. H.)[11] Even if this fact shows some level of control, the Government fails to explain how that shows Pan America "performs services that are

---

[11]   At the hearing, the Pangang Defendants objected to this exhibit on the basis that it had not been authenticated and on the basis that there was no evidence that the salary plan had been implemented. Although Special Agent Patillo attests that the document was located during the search of Pan America's offices during the execution of a search warrant, the Government has not put forth evidence to show it was implemented. (Patillo Decl., ¶ 4.c.) The Court overrules the objection. Assuming for the sake of argument the salary plan was implemented, the Court finds the evidence insufficient to establish an agency relationship.

13

1    sufficiently important to [PGSVTC] that if [PGSVTC] did not have a representative to perform

2    them, [PGSVTC's] own officials would undertake to perform substantially similar services."

3    *Bauman*, 644 F. Supp. 2d at 920 (citations and emphasis omitted).

4        The Court finds the Government has not shown that Pan America is PGSVTC's general

5    agent.  Accordingly, as to PGSVTC, the Government has not established that it complied with

6    the delivery requirement.  However, even if the Government had shown that Pan America is

7    PTSVTC's general agent, the Court still would grant the motion to quash service on PGSVTC

8    for the reasons discussed in the remainder of this Order.

9        **2.    The Mailing Requirement.**

10        To satisfy the mailing requirement, the Government must show it mailed the summons

11    "to the organization's last known address within the district or to its principal place of business

12    elsewhere in the United States."  Fed. R. Crim. Pro. 4(c)(3)(C).  The Government argues it has

13    complied with the mailing requirement by mailing a copy of each of the summons to Pan

14    America, which, as noted, it contends qualifies as the principal place of business in the United

15    Stats for each of the Pangang Defendants.[12]  Under this theory, and assuming that the

16    Government had established that Pan America was each Pangang Defendant's general agent,

17    the Court would be required to find that a general agent is - in fact - the "organization" that the

18    Government seeks to serve.  The Court finds the Government's argument unpersuasive.

19        The Court begins with the plain language of Criminal Rule 4.  Unlike the delivery

20    requirement, the mailing requirement does not state that a summons may be mailed to an

21    officer, director or a general agent.  It requires a summons to be mailed to the *organization's*

22    principal place of business in the United States.

23        The Government's theory that mailing a summons to a general agent is sufficient service

24    of process finds some support in the civil context.  For example, in the *Hickory Travel* case, the

25    court noted that "[o]ther federal courts addressing this issue have used jurisdictional analysis to

26    determine whether service on a subsidiary counts as service upon its parent."  213 F.R.D at 552

27

---

28        [12]    It is undisputed that none of the Pangang Defendants have an address within
this District.

14

*United States District Court*
For the Northern District of California

**United States District Court**
For the Northern District of California

1   (citing *Gallagher v. Mazda Motor of America*, 781 F. Supp. 1079, 1083 n.8 (E.D. Pa. 1992));

2   *see also Heise v. Olympus Optical Co., Ltd.*, 111 F.R.D. 1, 2, 6 (N.D. Ind. 1986).  However, in

3   contrast to the terms of Criminal Rule 4, which always requires the Government to mail a copy

4   of the summons to the organization, the terms of Civil Rule 4 require a party to mailing a copy

5   of the summons to an organization located within the United States only where service is made

6   upon an "agent is one authorized by statute and the statute so requires." Fed. R. Civ. P.

7   4(h)(1)(B).  Further, unlike Criminal Rule 4, Civil Rule 4 has express provisions for service

8   abroad and for service on foreign instrumentalities.  Fed. R. Civ. P. 4(h)(2), 4(j).

9          The Government also urges the Court to read Criminal Rule 4 in conjunction with

10   Criminal Rule 2, which provides that a court should interpret the criminal rules "to provide for

11   the just determination of every criminal proceeding, to secure simplicity in procedure and

12   fairness in administration, and to eliminate unjustifiable expense and delay." Criminal Rule

13   4(c)(3) is not silent on the issue of mailing, and the Court does not find it ambiguous in

14   requiring mailing to the organization, rather than to its general agent.  *Cf., Public Warehousing*,

15   2011 WL 1126333, at *7 (noting that "Rule 4 is silent on the issue of service on an alter-ego,"

16   and relying on Criminal Rule 2 to assist in interpretation of whether Criminal Rule 4 would

17   permit an alter-ego analysis).  The Court does not find the differences between Criminal and

18   Civil Rule 4 to be insignificant.  Thus, notwithstanding the provisions of Criminal Rule 2, the

19   Court finds that those differences caution against finding that the Government has complied

20   with the mailing requirement on a general agency theory in criminal proceedings.

21          The Government also argues that the purpose of Criminal Rule 4 has been satisfied,

22   because each of the Pangang Defendants have notice of these proceedings, and it argues that

23   "actual notice is a relevant consideration in determining that service on an agent in an otherwise

24   proper manner was sufficient." *Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406,

25   424 n.20 (9th Cir. 1977).  However, even in civil cases, actual notice without substantial

26   compliance with the requirements of Civil Rule 4, is not sufficient to bring a defendant within

27   the jurisdiction of the court.  *See, e.g, Benny v. Pipes*, 799 F.2d 489, 492 (9th Cir. 1986); *cf.*

28   *Johnson Matthey*, 2007 WL 2254676, at *2 ("the mailing requirement ... is not that 'ample

1    notice' be given"). Thus, the fact that the Pangang Defendants have notice of this proceeding is

2    relevant but not dispositive.

3         Finally, the Government's theory that mailing a summons to a general agent satisfies the

4    mailing requirement is not persuasively supported by the criminal cases that have addressed this

5    issue. In the *Johnson Matthey* case, the court granted the motion to quash on the basis that the

6    government failed to comply with the mailing requirement when it mailed a copy of the

7    summons to a domestic subsidiary of the foreign corporate defendant. The court construed the

8    mailing requirement strictly and found that the foreign defendant had "not been shown to be

9    present in the District of Utah and does not now have, nor has it ever had, an address in the

10   District, or a place of business within the United States." *Id.*, 2007 WL 2254676, at *2.

11   Accordingly, the court concluded that the government would have to "turn to an alternative

12   means to properly serve" the foreign defendant, for example, the Mutual Legal Assistance

13   Treaty between the United Kingdom, where the defendant was located. *Id.* That court,

14   however, did not consider whether the domestic subsidiary was a general agent or an alter-ego

15   of the foreign defendant. In addition, although it does not adopt the Government's argument,

16   this Court is not convinced that Criminal Rule 4 should be construed as restrictively as the

17   *Johnson Matthey* court construed it.

18        In contrast, in the *Chitron Electronics* and the *Public Warehousing* cases, the courts

19   found that the government complied with the mailing requirement on the basis that the domestic

20   subsidiaries, which also were defendants, were the *alter-egos* of the foreign defendants. Thus,

21   by sending a copy of the summons by mail to the domestic subsidiaries, the government was, in

22   effect, sending a copy of the summons to the foreign corporate defendants, *i.e.* the organization

23   to be served. *Public Warehousing*, 2011 WL 1126333, at *5-*8; *Chitron Electronics*, 668 F.

24   Supp. 2d at 306.[13]

25

26        [13]    The *Chitron* court does not use the term "alter-ego" in its analysis. However,
     the court's reasoning is based on facts that support a finding that the domestic subsidiary had
27   not maintained a separate corporate identity from its foreign parent. The court's finding that
     the domestic subsidiary was a "mere conduit" for the foreign parent also is in line with the
28   Ninth Circuit's alternate phrasing of the first prong of the alter-ego test. *See Bauman*, 644
     F.3d at 920; *see also Unocal*, 248 F.3d at 926 n.2 (citing *In re Telectronics v. Pacing*

1    The Court is persuaded that the only way for the Government to show that it has

2   complied with the mailing requirement, is to show that Pan America is the alter-ego of a

3   particular Pangang Defendant.  Because the Court has concluded that the Government met its

4   burden to show it complied with the delivery requirement only as to PIETC, the Court focuses

5   its alter-ego analysis on PIETC.

6           **3.      The Government Has Not Shown that Pan America is the Alter-Ego of
                    PIETC.**

7

8           In the Ninth Circuit, the alter-ego test is met when "(1) that there is such a unity of

9   interest and ownership that the separate personalities of the two entities no longer exist and (2)

10  that failure to disregard their separate identities would result in injustice.  The first prong of this

11  test has alternately been stated as requiring a showing that the parent controls the subsidiary to

12  such a degree as to render the latter the mere instrumentality of the former." *Bauman*, 644 F.3d

13  at 920 (quoting *Unocal*, 248 F.3d at 926).[14]

14          **a.      The Pangang Defendants are not estopped from arguing that Pan
                   America is not their alter-ego.**

15

16          As a preliminary matter, the Court addresses the Government's argument that the

17  Pangang Defendants should be equitably estopped from arguing that Pan America is not their

18  alter-ego.  Equitable estoppel operates as a shield "'by which a person may be precluded by his

19  act or conduct, or silence when it his duty to speak, from asserting a right which he otherwise

20  would have had.'" *Jablon v. United States*, 657 F.2d 1064, 1068 (9th Cir. 1981) (quoting

21  _____

22  *Systems, Inc.*, 953 F. Supp. 909, 918-19 (S.D. Ohio 1997) for its"useful discussion of alter
    ego as merger and agency as attribution"); *In re Telectronics. Pacing Systems, Inc.*, 953 F.

23  Supp. 909, 918-19 (S.D. Ohio. 1997) (attribution equates to finding the absent parent
    instigated the subsidiary's local activity and merger equates to finding the absent parent and

24  the subsidiary are in fact a single legal entity); *Sonora Diamond Corp. v. Superior Court*, 83
    Cal. App. 4th 523, 537-552 (2000) (discussing distinction between alter-ego and agency

25  theories in context of personal jurisdiction).

26          [14]     New Jersey law, where Pan America is incorporated, is in accord.  *See, e.g.,
    Department of Environmental Protection v. Ventron*, 94 N.J. 473, 500-01 (1983) (to pierce

27  corporate veil requires a showing "that the parent so dominated the subsidiary that it had no
    separate existence but was merely a conduit for the parent" and "when the parent has abused

28  the privilege of incorporation by using the subsidiary to perpetrate a fraud or injustice, or
    otherwise to circumvent the law"); *Verni ex rel Burstein v. Harry M. Stevens, Inc.*, 387 N.J.
    Super. 160, 199-200 (2006) (same).

17

1   *Black's Law Dictionary* p. 483 (5th ed. 1980)).  In order to show that the Pangang Defendants

2   should be estopped from arguing that Pan America is their alter-ego, the Government must

3   show that: (1) the Pangang Defendants know the true facts; (2) they intended that their conduct

4   would be acted upon or "must so act that the party asserting the estoppel has a right to believe it

5   is so intended; (3) [t]he latter must be ignorant of the true facts;" and (4) the Government must

6   have relied on the Pangang Defendants' conduct to its injury.  *Id.* at 1067 (internal quotations

7   and citations omitted).

8       The "true fact" at issue is whether Pan America is the alter-ego of each of the Pangang

9   Defendants.  In order to establish general agency and an alter-ego relationship, the Government

10   must establish that each of the Pangang Defendants exercised a specific level of control over

11   Pan America.  The Government's estoppel argument is premised upon the fact that Mr. Wang

12   and Mr. Zhang entered the United States on L1-A visas.  Again, it is clear that the Pangang

13   Group was required to show some measure of control over Pan America to obtain L1-A visas.

14   However, the Court does not find that the level of control required to obtain an L1-A visa is

15   commensurate with the level of control required to establish an alter-ego relationship.  *Compare*

16   *Bauman*, 644 F.3d at 920 (setting forth tests for alter-ego status) *with* 52 Fed. Reg. 5378-01,

17   5742, 1987 WL 127799 ("[S]ince the L category was created, Service policy has been based on

18   the common or general meaning and usage of" the terms employer, affiliate or subsidiary,

19   "which imply 'control' by virtue of ownership.").  Moreover, the Government has not provided

20   the Court with any authority to support such an interpretation.

21       The Court finds that the Government has not shown that the Pangang Defendants should

22   be estopped from arguing that Pan America is not their alter-ego.

23       **b.    Unity of interest.**

24       In order to determine whether there is a sufficient unity of interest, the Court may

25   consider such factors as whether the subsidiary is inadequately capitalized and whether the

26   "parent dictates every facet of the subsidiary's business - from broad policy - to routine matters

27   of day-to-day operation." *Unocal*, 248 F.3d at 926-27 (internal quotation marks and brackets

28   omitted).  The Court may also consider whether the parent and subsidiary co-mingle funds, state

18

1   that one entity is liable for the debts of the other, use the same offices and employees, or

2   disregard other corporate formalities. *See, e.g., Smith v. Simmons*, 638 F. Supp. 2d 1180, 1191

3   (E.D. Cal. 2009) (applying California law and citing *VirtualMagic Asia, Inc. v. Fil–Cartoons,*

4   *Inc.,* 99 Cal. App. 4th 228, 245 (2002)), *aff'd* 409 Fed. Appx. 88 (9th Cir. 2010).

5          In order to show the requisite unity of interest, the Government again relies on the

6   evidence it relied on to support its argument that Pan America is the general agent for PIETC.

7   In addition, Pan America's Board of Directors consists of Mr. Wang and one representative

8   each from Pangang Group and PIETC. (Wang Decl. ¶ 10.) However, that fact alone is not

9   sufficient to establish the requisite control to establish an alter-ego relationship. *See, e.g.,*

10  *United States v. Bestfoods*, 524 U.S. 51, 69 (1998); *Kramer Motors, Inc. v. British Leyland,*

11  *Ltd.*, 628 F.2d 1175, 1177 (9th Cir. 1980). The Government does not suggest that Pan America

12  is inadequately capitalized, but it does suggest that Pan America's only source of income is

13  PIETC. (*See, e.g.,* Szamoseggi Decl., Exs. 17, 24.) The Government also relies on the letters

14  signed by Chairman Fan on Pan America letterhead, which does show some disregard for

15  corporate formalities.

16         Pan America does keep separate books and records, although Pangang Group has the

17  right to audit those books. (Wang Decl., ¶ 13; Patillo Decl., Ex. T.) "A parent corporation may

18  be directly involved in financing and macro-management of its subsidiaries, without exposing

19  itself to a charge that each subsidiary is merely its alter ego." *Unocal*, 248 F.3d at 927. For

20  example, in the *Kramer Motors* case, the court found that the plaintiff failed to show a domestic

21  subsidiary was the alter-ego of a foreign defendant, even though the companies had some

22  overlapping directors, the parent had general executive responsibility for the operations of its

23  subsidiary "and reviewed and approved its major policy decisions," acted as a guarantee for its

24  subsidiary's financial obligations, and worked closely with the subsidiary on pricing issues.

25  *Kramer Motors*, 628 F.2d at 1177; *see also American Telephone & Telegraph Co. v.*

26  *Compagnie Bruxelles Lambert*, 94 F.3d 586, 591 (9th Cir. 1996) (finding no alter-ego

27  relationship where facts showed that parent's control over subsidiary reflected no more than

28  normal parent-subsidiary relationship).

United States District Court
For the Northern District of California

19

**United States District Court**

For the Northern District of California

1    The Court finds that the Government has not shown the requisite unity of interest to

2    establish an alter-ego relationship between Pan America and PIETC.

3              **c.     Fraud or injustice.**

4        Even if the Government had established the requisite unity of interest, the Court

5    concludes it has not shown the requisite fraud or injustice. The Government argues that "failing

6    to pierce the corporate veil would result in an injustice," because it would permit PIETC from

7    answering the charges in this case. (Opp. Br. at 25:12-24.) However, the Government has not

8    persuasively shown that PIETC structured Pan America in such a way that it was designed as to

9    avoid subjecting it to liability within the United States. That is, the Government has not shown

10   that it is PIETC's actions, rather than the terms of Criminal Rule 4, that would prevent PIETC

11   from answering the charges. *Cf. Alfred L. Wolff*, 2011 WL 4471383, at *5 (concluding that

12   service was not supported under an alter-ego theory where, although defendants had been

13   charged with fraud, facts did not show that defendants had been formed to perpetrate a fraud on

14   the United States); *Smith*, 638 F. Supp. 2d at 1192 (noting that, under California law, difficulty

15   in collecting a judgment is not sufficient to establish fraud or injustice; rather, California courts

16   generally require some finding of bad faith conduct).

17       There is some support for the Government's argument in the *Public Warehousing* case,

18   but that court's finding was premised in large part on the fact that the foreign defendants and the

19   domestic subsidiary held themselves out as one company. Under Ninth Circuit law, such a

20   finding would help to establish the first prong of the alter-ego test. The *Public Warehousing*

21   court did not, however, expressly consider whether failing to pierce the corporate veil would

22   work an injustice, which is required under *Bauman. See Public Warehousing*, 2011 WL

23   1126333, at *5-*8. Thus, the Court finds *Public Warehousing* of limited value in evaluating the

24   second prong of the alter-ego test. In *Chitron Electronics*, the court found it significant that the

25   foreign defendant took efforts to disguise the fact that customers were dealing with a foreign

26   company. 668 F. Supp. 2d at 306. There are no such facts in this case. *See Alfred L. Wolff*,

27   2011 WL 4471383, at *7 (distinguishing *Chitron Electronics* on that basis).

28

**United States District Court**
For the Northern District of California

1    When the Court considers the evidence in its entirety, although that evidence is

2    sufficient to show that Pan America acted PIETC's general agent, the Court finds the facts in

3    this case more akin to those in *Kramer Motors*, and *Alfred L. Wolff*, than *Chitron Electronics* or

4    *Public Warehousing*.  Accordingly, the Court finds that the Government has not shown that Pan

5    America is PIETC's alter-ego.  Therefore, it has failed to show that it mailed a copy of the

6    summons to PIETC.

7        The same would be true for Pangang Group, Titanium and PGSVTC.  The Government

8    relies on the same evidence it used to argue that Pan America was these entities' general agent

9    to argue that Pan America is their alter-ego.  Although there is evidence that Chairman Fan

10   signed letters describing himself as "Chairman" on Pan America's letterhead, without more, the

11   Court finds that evidence insufficient to establish a complete disregard of corporate formalities.

12   Moreover, the Court the Government's argument regarding "fraud or injustice" applies to all of

13   the Pangang Defendants, and the Court has found that argument unpersuasive.  Therefore, even

14   if the Court found that Pan America acted as a general agent for any of these entities, the Court

15   still would grant the motion to quash, because the Government has not shown that Pan America

16   is their alter-ego.

17   **C.    Alternative Means of Service.**

18       The Government acknowledges that the United States and the PRC have entered into an

19   Mutual Legal Assistance Agreement ("MLAA") regarding assistance in criminal cases.  The

20   Government, however, argues that the MLAA is irrelevant for two reasons.  Although the

21   Government argues that the there is no private right to enforce the MLAA, *see Chitron*

22   *Electronics*, 668 F. Supp. 2d at 306-07, the Pangang Defendants are not asking the Court to

23   enforce the terms of the MLAA.  They rely on it solely to argue that the Government might be

24   able to use it to serve them.

25       The Government also notes that the terms of the MLAA provide that "the Requested

26   Party shall not be obligated to effect service of a document which requires a person to appear as

27   the accused."  MLAA, Art. 8, para. 1.  During oral argument, the Government conceded that

28   this language provides the Requested Party with discretion to effect service.  However, the

1   Government represented that it is the judgment of the United States Department of Justice's

2   Office of International Affairs that the PRC would not agree to effect service on the Pangang

3   Defendants.  Thus, according to the Government, it would be futile to attempt service by way of

4   the MLAA.

5        Accepting that representation for purposes of this motion, it appears that the

6   Government will take the position that it will be left without a means to effect service on the

7   Pangang Defendants.  The Pangang Defendants have not asked the Court to dismiss the

8   Superseding Indictment, and the Court has only ruled that the summonses served on the

9   Pangang Defendants should be quashed.  The Government and the moving parties should

10  address how they intend to proceed in a joint status report that is due on August 16, 2012.

### CONCLUSION

12  For the foregoing reasons, the Court GRANTS the Pangang Defendants' motion and

13  HEREBY QUASHES service on each of these defendants.

14  **IT IS SO ORDERED.**

*Jeffrey S. White*

**United States District Court**
For the Northern District of California

22

1   Dated: July 23, 2012

2                                                JEFFREY S. WHITE
                                                 UNITED STATES DISTRICT JUDGE
3

4

5

6

7

8

9

10

**United States District Court**
For the Northern District of California

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28