1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
UNITED STATES OF AMERICA        :
                               :
                               :
     -vs-                       :        Case No. 1:12-cr-3
                               :
                               :
KIM DOTCOM, et al.,             :
               Defendants.      :
                               :
-------------------------------:
```

HEARING ON MOTIONS

April 13, 2012

Before:  Liam O'Grady, Judge

APPEARANCES:


Jay V. Prabhu, Lindsay A. Kelly and Glenn C. Alexander,
Counsel for the United States


Paul F. Brinkman, William A. Burck and Ira P. Rothken,
Counsel for Defendant Megaupload


Marc J. Zwillinger, Robert Huff, Jr. and Christopher L. Harlow,
Counsel for Carpathia


Julie P. Samuels and John S. Davis, V,
Counsel for Kyle Goodwin


W. Clifton Holmes, Counsel for Valcom and Microhits


Paul M. Smith and Julie M. Carpenter, Counsel for MPAA

3

INDEX

ARGUMENTS BY:

    MR. ZWILLINGER                                    5
    MR. PRABHU                                       12
    MR. SMITH                                        20
    MS. SAMUELS                                      22
    MR. ROTHKEN                                      27
    MR. HOLMES                                       33
    MR. ZWILLINGER                                   35


COURT'S RULING

                                                     38

1          THE CLERK:  Criminal case number 1:12-cr-3, the

2   United States of America versus Kim Dotcom, et al.

3          Counsel please identify themselves for the record.

4          MR. PRABHU:  Good morning, Your Honor.  Jay Prabhu,

5   Lindsay Kelly and Glenn Alexander for the Government.

6          THE COURT:  All right, good morning.

7          MR. BRINKMAN:  Good morning, Your Honor.  Paul

8   Brinkman and William Burck from Quinn Emanuel Urquhart &

9   Sullivan, and Ira Rothken from The Rothken Law Firm.

10         THE COURT:  All right.  Good morning to each of you.

11         MR. ZWILLINGER:  Good morning, Your Honor.  Marc

12  Zwillinger and Bart Huff from ZwillGen on behalf of Carpathia,

13  with local counsel Chris Harlow from SNR Denton.

14         THE COURT:  All right, good morning.

15         MS. SAMUELS:  Good morning, Your Honor.  Julie

16  Samuels from the Electronic Frontier Foundation here with John

17  Davis on behalf of Kyle Goodwin.

18         THE COURT:  All right.  Good morning, ma'am.

19         MR. DAVIS:  Good morning.

20         THE COURT:  Good morning.

21         MR. HOLMES:  Good morning, Your Honor.  Cliff Holmes

22  of Dunlap, Grubb & Weaver on behalf of nonparties Valcom,

23  Incorporated and Microhits, Incorporated.

24         THE COURT:  All right, good morning to you, sir.

25         MR. HOLMES:  Thank you.

1          MS. CARPENTER:  Good morning, Your Honor.  Julie

2    Carpenter on behalf of the MPAA members.  And with me is Paul

3    Smith, who has been admitted pro hac vice, and he will be

4    arguing this morning.

5          THE COURT:  All right, good morning to each of you.

6          All right, there is a series of motions on.  The

7    vehicle for getting here was Carpathia's motion to be relieved

8    of the financial responsibility of continuing to store the data

9    from Megaupload.  So, why don't we start there.

10          I have read your pleadings, and I am sympathetic to

11    your position.  And I understand you have a board that you want

12    to use as a demonstrative?

13          MR. ZWILLINGER:  That's right, Your Honor.

14          THE COURT:  Certainly, go ahead.

15          MR. ZWILLINGER:  Your Honor, I thought it would be

16    helpful to start with just a brief description of the role

17    Carpathia played as a service provider in this case, and then

18    to show some pictures of the servers at issue.

19          If I can show the other picture first.

20          THE COURT:  The other parties have had an opportunity

21    to look at those?  All right, why don't you--

22          MR. ZWILLINGER:  Your Honor, Carpathia is a web

23    hosting company.  And what we did in this case is we provided

24    managed hosting services to Megaupload.  That means we provided

25    the physical server hardware, the physical security.  We were

6

1   responsible 24/7, 365 days a week to make sure the physical

2   hardware was working.

3       So, with our partner Equinix, we supplied power, we

4   supplied cooling, we did the connectivity to the other

5   computers in the data center, we replaced the drives that

6   failed every day.

7       We didn't run or manage the Internet sites.  We had

8   no access to the computers at all.  In fact, we just ran the

9   platform.  And when I say we had no access, it's because when

10  we set up the servers and gave the default passwords to

11  Megaupload, they would invariably change the passwords

12  immediately to control access.  So, we were responsible for the

13  platform only.

14      And at the time up to the point the Government

15  executed the search warrant, Exhibit A, this picture, is what

16  the servers looked like.  You're looking at nine servers in a

17  rack and three racks of servers.  Each one of those servers has

18  24 hard drives in it.  They are about one-and-a-half terabytes

19  per hard drive.  Which means there is about 30 to 40 times more

20  computing power in each one of those servers than a computer

21  that might be sitting on your desk.

22      We have 83 racks of those storage servers, and we had

23  them in four locations across the United States.  The majority

24  of them were in the Equinix data center here in Ashburn,

25  Virginia.  But we also had servers in LA, Phoenix and Toronto.

1        The out-of-pocket costs of keeping all these servers

2    powered, cooled and running was running about $9,000 a day.

3    So, when the Government executed the search warrant in this

4    case and Mega stopped paying and could no longer be in

5    business, we needed to get out of our, the data centers.  And

6    so, those contracts, which we didn't maintain, ended on

7    April 6.

8        On April 6 we started bringing all the servers to

9    Harrisonburg, Virginia, which is in the jurisdiction of this

10   court, and we brought the servers from all over the country,

11   even though the search warrant pertained only to the ones in

12   Virginia and Toronto.

13       If you look at Exhibit B, Your Honor, this is a

14   picture of what the servers look like now.  They are in the

15   process of all being off-loaded and stacked in Harrisonburg,

16   Virginia.  You will see that they are stacked eight servers

17   high.  There are four stacks pictures or five stacks pictured.

18   So, you have 40 servers there.

19       At the end of the day when they finish arriving, we

20   are going to have 120 stacks of these things in a climate

21   controlled data center.  It is climate controlled because

22   without climate control, the hard drives tend to fail.

23       So, the servers are all sitting there, and we are

24   going to have 120 stacks of those, and that would be space that

25   would be otherwise used for customer servers.

1        Moving for a protective order wasn't our first choice

2 or first step in this case.  We waited patiently for several

3 weeks to think that the Government and Mega might work out a

4 plan for the disposition of the servers.

5        Then we tried to talk to the Government about the

6 Government taking possession of the servers.  And finally, we

7 worked out an arrange with Mega so that Mega would take

8 transfer of the physical servers to unite their interest in the

9 data that's on them with the physical hardware.

10        The Government and the MPAA objected to that

11 transfer.  And then we felt like we had to turn to the Court.

12        It seems to us there are a lot of parties that have

13 interest in the data on these servers except for one, and

14 that's us.  We have no interest in the data.

15        Our only interest was in the physical hardware.  And

16 even that we are willing to loan to any party in this case to

17 take possession of the physical hardware until the duration of

18 the proceeding and the hardware can be returned.

19        Even before today's hearing, we went to all of the

20 parties to see if there was something that could be worked out

21 that we could make a joint recommendation to the Court.  And it

22 turns out every party but one agrees that their interests would

23 be served, in fact better served if the servers were in the

24 hands of the Government.  The party that doesn't agree, of

25 course, is the Government.

1    I think the reason that it makes sense for the

2    Government to have them in these circumstances is the

3    Government can address each of the parties' interests in known

4    defined ways.  There is an established procedure in the

5    criminal law for the defendant to get access to material

6    evidence under rules of criminal procedure.  Third parties,

7    like Mr. Goodwin, can get access through the forfeiture rules,

8    21 U.S.C. 853(h), if they are innocent owners of the data the

9    Government has.  And the interests of the copyright holders can

10   be satisfied because there won't be any further distribution of

11   what they allege to be infringing material.

12   And the Government spends a lot of time explaining in

13   their briefing why Mega shouldn't be able to force them to take

14   the servers.  I understand that, but they don't explain why

15   Carpathia should be forced to take the servers instead.

16   In fact, I would like to point out that the

17   Government's interest in the servers, aside from being way more

18   that Carpathia's, is that they alleged in the indictment,

19   paragraph 112, page 82 of the indictment, that they were

20   entitled to forfeiture of all the copyright infringing

21   materials that are possessed by Mega.  Those materials are

22   possessed on the servers.

23   So, if all of the infringing materials are subject to

24   forfeiture of this Court, we think it's another reason why the

25   Government should be taking possession of them.

1    Two other things, Your Honor, finally.  The

2 Government makes some allegation, it is not very specific, but

3 they believe that there might be some child pornography on

4 these servers, and that's why we shouldn't be able to transfer

5 them.  It's not with a lot of specificity so that we can figure

6 where on these 25 petabytes of data this child porn might

7 reside.  But if there is contraband on the servers, we

8 certainly shouldn't remain in possession of them.  Those should

9 be turned over to Government.

10    And finally, the last minute request that was made

11 last night from Valcom and Microhits to preserve certain

12 aspects of the data, specifically the server logs, proves our

13 point exactly.  I know that is a separate civil matter, but for

14 us, preservation is all or nothing.  We just preserve the

15 entirety of the data or preserve no data.

16    We can't get access to log in and get the server

17 logs.  There are only two parties that can do that, Megaupload,

18 who has the passwords and controlled the data, and the

19 Government, who in the course of executing the search warrant

20 found a way to bypass the password protection and do the

21 imaging they need, we can't do that.  So, asking us to preserve

22 the server logs is asking us to preserve all 25 petabytes of

23 data until someone can access it.

24    THE COURT:  So, all the hard drives are going to

25 Harrisonburg, Virginia to storage in a climate controlled

1   warehouse.

2          How much is that costing?

3          MR. ZWILLINGER:  The space, the lease space in that

4   warehouse that will allocated to the servers will be about

5   $37,000 a month.

6          THE COURT:  $37,000 a month.  All right.

7          MR. ZWILLINGER:  And they are not powered or cooled

8   or running or networked, they are just sitting there awaiting

9   final disposition.  They are just stacked.

10          THE COURT:  Right.  And they are unavailable for

11   Carpathia to lease to somebody else as well.

12          MR. ZWILLINGER:  That's correct.

13          THE COURT:  And did Carpathia get notice from the

14   Government at any time prior to the seizure that they were

15   storing pirated copyright material and they were subject to any

16   criminal violations?

17          MR. ZWILLINGER:  No, not in that way, Your Honor.

18   Occasionally in the years of hosting Mega, there would be a

19   specific instance where the Government would, you know, execute

20   a, serve a subpoena or execute a search warrant for a small

21   portion of data.  One was done a year prior by this very

22   office.

23          So, there have been instances in the years of hosting

24   that somebody had made a specific request for a specific piece

25   of data, but we had no notice that 1,100 servers, or at least

1  in Virginia 500-plus servers would be seized and taken as

2  criminal violations.

3          THE COURT:  In negotiating with Megaupload to

4  transfer the, what was your understanding of the agreement

5  between Carpathia and Megaupload to transfer the hard drives?

6          MR. ZWILLINGER:  Well, it morphed a little bit over

7  time.  The agreement we signed involved the full transfer of

8  all of the 1,100 servers for payment of a million dollars.

9  There was an additional fee for a continuing to host them until

10 April 6.  That's obviously passed.  But the sale of the servers

11 was for a million dollars, which is slightly under their book

12 value.

13         At the time we originally proposed it, there were no

14 particular restrictions on what Mega was going to do with it,

15 other than it was for use in the criminal case.  Subsequent to

16 that, they offered to make several series of restrictions on

17 how they would and would not use it, which I could better let

18 them address if they are allowed to you.  But it was our

19 understanding that it was going to be used just for use in the

20 criminal case.

21         THE COURT:  Okay.  All right.  Thank you, sir.

22         MR. ZWILLINGER:  Thank you, Your Honor.

23         THE COURT:  Why don't we lead off with the Government

24 responding.

25         MR. PRABHU:  Thank you, Your Honor.

1          Just so the record is clear, the Government is not

2   seeking the destruction of the content of the Mega servers at

3   issue here.  In fact, it was the United States that publicly

4   notified the Court and any interested parties on January 27,

5   2012, that the hosting companies were planning on wiping the

6   content of those servers.  As the Court will recall, I filed a

7   letter with chambers that was publicly filed.

8          If not for the Government's notice at that time, it

9   is very possible that the companies, including Carpathia, would

10  have destroyed the data within days of the Government's

11  searches and the issues today would not be before the Court.

12          During the investigation of this case--

13          THE COURT:  What's the Government's--  I understand

14  that.  I promise you, I read the pleadings.  And so, here we

15  are today.  The Government has done a sampling.  Obviously, the

16  defendants are very interested in trying to undermine the

17  legitimacy of the sampling done, and in an attempt to

18  ultimately free up some assets for use in defending the action.

19  And I would predict that any Farmer hearing would go that way.

20          So, the Government doesn't need the remaining stored

21  information?

22          MR. PRABHU:  That's correct, Your Honor.

23          THE COURT:  And they have what they need.  And so,

24  the issue now is whether it's going to be preserved.

25          Megaupload has made an offer.  I don't know where

1    they are going to get a million dollars to buy it, but say they

2    have got a million dollars to buy the hard drives from

3    Carpathia, what's the Government's objection to that?

4            MR. PRABHU:  Well, first of all, Your Honor, the

5    Government was notified during its discussions with Carpathia

6    and Mega that a civil preservation demand had already been

7    served on January 31, 2012, for these exact servers by the

8    Motion Picture Association.  And we were not notified by those

9    parties that we were dealing with.  In fact, we heard that from

10   MPAA directly.

11           And once we were told that there was a preservation

12   request, us being involved in allowing a transfer of allegedly

13   infringing materials to the infringer, become an unacceptable

14   situation.

15           So, the Government's hands were tied at that point.

16   We couldn't allow the servers to be transferred, and yet we

17   were being asked to approve this deal.  And so, we stopped, we

18   basically stopped negotiating at that point.

19           The question of whether they could transfer them is

20   very complicated, as the Court obviously knows, because, first

21   of all, it would be putting evidence of a civil matter in the

22   hands of the defendant.  And in fact, now, as opposed to when

23   we filled our initial pleadings in this case, there is actually

24   a civil matter in front of this Court.

25           And so, preservation of those materials can be done

1  purely in the civil process.  And to be clear, Carpathia is not

2  a third party that has no interest in this case.  They are a

3  potential defendant in other proceedings related to these

4  servers because, as they just said, they ran these servers for

5  years.  And it's unclear their level of knowledge, as Valcom

6  indicates in their filing, and they might be a defendant.

7          One thing is clear, Carpathia did make $35 million

8  plus hosting these servers for Megaupload.  They got thousands

9  of notices of infringement from copyright holders.  And so,

10  it's not like this was really a surprise.

11          Also, with all due respect, they are being a little

12  bit disingenuous about their ability to access these servers.

13  They could do exactly what the Government did, which is hire

14  forensic persons to access the data directly and go around the

15  passwords.  Megaupload was able to do it.  Carpathia could do

16  it.

17          And so, forcing the Government to step in and take on

18  responsibility for these servers, would just be a massive

19  burden on the Government and the taxpayers.

20          And in the filings by the different parties in this

21  case, it shows what would happen.  Mr. Goodwin could, under the

22  rules, force the Government to go get his files.  And now he

23  has that remedy, he could go to Carpathia and say, you have my

24  property.  If he has a legal claim, he can make that case.  Or

25  he could pay them.

1          And the problem with all these solutions is it

2    presupposes that the Government can do all these things and

3    Carpathia can't.  That's not the case.

4          If they have contractual issues about the data that

5    they have in their possession, those can be dealt with in civil

6    litigation, they can be dealt with in negotiation, but they

7    just want to get out.  And, Your Honor, there is no reason just

8    because they want to get out, that you have to push the

9    Government in.

10          And frankly, the burden on the Government is much

11    greater than it is to Carpathia because of the ongoing criminal

12    case.  If it's in our custody and control, it introduces

13    petabytes of information that we are going to have to deal with

14    the defendant on, defendant Megaupload on.

15          In every search warrant the Government executes, it

16    always has to figure out what it can seize reasonably.  And

17    that's what happened in this case.  They went into a server

18    farm and they took some data.

19          To require the Government to have responsibility for

20    all the data, even though it seized a certain amount for its

21    criminal case, is a burden I just don't see how the Court can

22    impose on the Government.  And we're not talking a few hundred

23    thousand dollars.  We are talking tens of millions of dollars

24    potentially down the road.

25          And that's not necessary here.  These servers can be

1   preserved in the civil matters, including the one in front of

2   the Court.  There are, the claims by third parties for need to

3   access to all this data can be addressed.  If there are

4   out-of-pocket costs that Carpathia experiences, they can apply

5   to the Court for some relief.

6        So, all those things can be dealt with without

7   creating this huge burden on the Government to deal with a

8   massive server farm that it didn't seek to seize.

9        THE COURT:  So, what is your overall solution?

10       MR. PRABHU:  Your Honor, the Court, because it has

11   authority over a civil matter involving these servers, can

12   order them to be preserved and leave them in the possession of

13   Carpathia.  And then they can apply to the Court for any relief

14   related to costs.

15       And on the cost issue, it's important to note that

16   Carpathia is not expending new resources for the storage of

17   these servers.  The only cost to them is the ability to

18   repurpose the servers.

19       Now, that's a contractual issue between them and

20   Megaupload and potentially the users that could be resolved in

21   a civil dispute.  That's not something that's in the criminal

22   case before the Court.

23       THE COURT:  Yeah, but Carpathia now has the ability

24   in the civil context to sell the hard drives to Megaupload.

25   And the preservation order would carry to Megaupload in the

1   civil context, and Carpathia would be out of the, at least out

2   of the responsibility of preserving and paying for the data in

3   the hard drives, right?

4           MR. PRABHU:  Actually, I don't think so, Your Honor,

5   because at least one of the potential civil litigants who is

6   here today has said that they don't believe that the infringed

7   data should be in the possession of the infringer.  And so,

8   it's trusting the thief with the money.

9           THE COURT:  Well, every civil case you sue somebody

10  for infringement of copyrighted material, you know that they

11  have the copyrighted material.  And so, every case, virtually

12  every case starts that way.

13          MR. PRABHU:  The difference here though, Judge, is

14  that those parties are before the Court, and here they are not.

15  They are fighting extradition from various countries--

16          THE COURT:  Well, we have got--  Separate for me the

17  argument--  Because Megaupload is a criminal defendant, a

18  corporate entity who has not been served with a summons.  So,

19  they are kind of hanging out there, and that's an issue that

20  maybe we need to talk about as well.  But, you know, they are

21  not fighting extradition, correct?

22          MR. PRABHU:  Well, the 68 percent shareholder of the

23  company and all of the directors are.

24          THE COURT:  Right.

25          MR. PRABHU:  And so, the question is, is that--  It's

1    not like a public corporation that they would show up.  It's

2    seven people who actually don't want to show up.

3           So, there is a question of whether that has any

4    import because it is a majority controlled company.  And we

5    point the Court to 28 U.S.C., just so I get the number right,

6    2466, which talks about the ability of either a defendant, a

7    personal defendant or a corporate defendant to come in and get

8    any benefits from the Court.  They are prevented from doing

9    that if they don't willingly appear.

10          But to go back, could Mega, if it had a million

11   dollars in untainted funds, they would have to deal with the

12   preservation demand of the Motion Picture Association.  And to

13   my knowledge, they have never satisfied the Motion Picture

14   Association's concerns about the treatment of that data.

15          The point of whether there is child pornography on

16   some of these servers, we've filed under seal some information

17   related to that.  But it would be a complicating factor--

18          THE COURT:  As I understand it, the Government is not

19   seeking to go back in and look at further data on these

20   servers, correct?

21          MR. PRABHU:  That's correct, Your Honor.

22          THE COURT:  All right.

23          MR. PRABHU:  Thank you, Your Honor.

24          THE COURT:  All right, thank you.  Why don't we have

25   MPAA and the other third parties that have come in--

1          MR. SMITH:  Thank you, Your Honor.  Paul Smith.

2          Your Honor, at this point, as the matters have

3 evolved, we really have, the movie studios really have only one

4 primary concern.  Which is that these servers with the data on

5 them not find their way back into the stream of commerce and

6 have the Megaupload service reset up.

7          As a technology matter, if you could ship these out

8 of the country to Romania, you could have this whole thing

9 running again.  It is probably the largest collection of

10 infringing copies of material in the world.

11         And so, it is a matter of great concern to the

12 studios that they not be dealing with this whole thing all over

13 again.  Whether or not the right answer is simply to allow

14 Carpathia to reuse the servers or whether it is to have some

15 other system to preserve them for use in litigation, is not,

16 frankly, at this point our primary concern.  As long as the

17 Court and the parties can work out an arrangement that they

18 will be secured and not simply shipped off to Megaupload to

19 start using them again in their criminal enterprise, that's our

20 concern.

21         We had initially gotten very concerned because we

22 heard that there was an arrangement simply to sell them to the

23 principals of Megaupload, not some kind of an evidentiary

24 process or preservation process, but simply that they would get

25 them back.  And since many of them are all over the world, it

1  didn't seem to us like that was a particularly good way to deal

2  with stolen goods.

3      And so, I don't want to complicate matters except to

4  make sure that the Court, if it is going to get involved in

5  addressing the ultimate fate of these things, it ought to make

6  sure it doesn't do something that risks that the whole criminal

7  enterprise be restarted in some country where they simply will

8  be beyond the reach of American legal process.

9      THE COURT:  I understand.  Is there no way to catalog

10  what's in these servers?

11      MR. SMITH:  The amount of information is so huge that

12  it would be an extraordinarily expensive process simply to go

13  in there and mirror the whole thing or catalog it.  Of course,

14  the Government has a fairly large sample, I think it is 1

15  percent or something that they have taken, but I am not sure

16  that it would be possible to completely catalog it without a

17  very huge effort.

18      THE COURT:  I mean, this threat of civil litigation

19  for the copyright infringements, would it not require the

20  Motion Picture Association to go in there and find infringing

21  material?

22      MR. SMITH:  Well, the Government now, since we got

23  involved in this, has indicated that they have some thousands

24  of actual copies of works.  They also have records of every

25  single work that was on there, so-called hashes, a list of all

1  of them, which you can then match up with works out in the

2  Internet.

3  So, given that the Government has indicated they

4  would almost certainly be subject to a subpoena at an

5  appropriate point in time from a civil proceeding, our concern

6  is less about getting access to them or even preserving them

7  now than it is simply that they be kept secure.

8  THE COURT:  Or destroyed.

9  MR. SMITH:  Right.  I mean, obviously there is

10  concerns, as I am sure the next person will talk about,

11  innocent parties who have private videos up there, but clearly

12  a vast majority of this stuff is infringing and it should not

13  be returned either to the people who posted it or to somebody

14  else who wants to operate another massive criminal enterprise.

15  THE COURT:  All right.  But the MPAA is not

16  interested in taking possession of the hard drives at this

17  time?

18  MR. SMITH:  I am not in a position to make that

19  offer, Your Honor.

20  THE COURT:  All right.  Thank you, sir.

21  MS. SMITH:  Thank you.

22  THE COURT:  Good morning, Ms. Davis.

23  MS. SAMUELS:  Good morning, Your Honor.  Thank you so

24  much for listening to us today.  Clearly we're talking about an

25  unprecedented amount of data here.  I think everyone can at

1    least agree about that.

2          THE COURT:  Yeah.

3          MS. SAMUELS:  And we think it's really important that

4    the Court its exercise its equitable jurisdiction here to make

5    sure that individuals like our client, Kyle Goodwin, who did

6    nothing wrong, there is no allegation that Mr. Goodwin did

7    anything wrong, are able to get their private property back.

8          We think this Court is well within its bounds to

9    exercise that type of jurisdiction.  It exists in the case law,

10   it exists in the Federal Rules of Criminal Procedure, it exists

11   in RICO and the other relevant statutory provisions.

12         But what I would like to talk briefly about is that

13   while this is not a traditional taking of our client's

14   property, it's not a traditional seizure, it's not a

15   traditional forfeiture, as a practical matter he has got no

16   access to it, absolutely no way to get his property back.

17         And when we start thinking about seizures and

18   forfeitures and we think about how those existed kind of in the

19   brick and mortar world, in those cases innocent third parties

20   can get their stuff back.  They can get into their safety

21   deposit in the bank that has been seized.  They can get access

22   to their offices in a building that has been seized.

23         But just because we have moved from this analog world

24   to a digital world, doesn't mean that we should kind of throw

25   those rights of the innocent third party out--

1          THE COURT:  Who do you think has Mr. Goodwin's

2   property?

3          MS. SAMUELS:  Well, that's an interesting question,

4   Your Honor.  I think that some combination of a lot of the

5   parties here today have access to his property.

6              I guess physically, they are in Harrisburg, Harris,

7   Virginia.  Sorry.  Yes, Harrison.  But as I understand from

8   talking to the parties and from the papers filed before Your

9   Honor, it's going to require some combination of a bunch of

10  different parties to actually make that happen.

11             Which is why we've proposed some kind of, not short

12  of a traditional receiver, but some kind of independent expert

13  who can help come up with a process for these folks.  And, you

14  know, frankly, I don't care who has physical custody of the

15  servers.  I don't object if it's the Government, so long as

16  there is some process in place with a time deadline, Your

17  Honor, that creates a way for these folks, Mr. Goodwin and

18  others like him, to, without having to go through the expense

19  of civil federal litigation, be able to get notice that they

20  are able to access their files.  Maybe come up with some kind

21  of procedural way for them to attest that their files aren't

22  infringing or otherwise contraband, and we have in place some

23  independent experts who can help make that happen.

24          THE COURT:  Well, with my very basic understanding of

25  what this system looks like, at this stage it requires the hard

1    drives all to be energized, the software systems that operate

2    them to be energized, and to give the opportunity for the

3    customers to download whatever they had being stored and

4    retrieve it.  Is that essentially what we are talking about?

5         MS. SAMUELS:  Well, Your Honor, I don't think we're

6    talking about just flipping a switch back on.  I don't think

7    that that is realistic from anyone's perspective at this point.

8    I think we're talking about some kind of procedure where

9    perhaps the Government would have to unfreeze some of the more

10   than $100 million in assets it seized to allow for these

11   innocent third parties to petition to get their stuff back

12   without having to go through federal litigation.

13        And I think there is some precedent for this.  We

14   have seen in the Southern District of New York the online

15   gambling cases, this was all in our papers, and that was

16   agreed, you know, the U.S. Attorney agreed to it.  But in that

17   case, a monitor was appointed and the defendant funded that.

18        And, you know, I would just say that I think a lot of

19   this chaos, if you will, especially with regard to our client,

20   was of the Government's making.

21        And what I am also concerned about is that we're

22   seeing more and more of these seizures of Web sites and domain

23   names, this is happening all the time.  And I think there needs

24   to be procedures like this from the outset next time so that

25   this can be handled in an organized fashion.

1          THE COURT:  How do you handle, you start off by

2    saying there is an incredible amount of data, and then you are

3    now talking about the Government somehow picking its way

4    through the data, which would take literally years and years,

5    and you have got, now you have also, we have just heard from

6    the MPAA, you know, which believes that there are just

7    thousands and thousands of pirated copyright material on there.

8          MS. SAMUELS:  I don't think, Your Honor, it's the

9    Government's responsibility to give everyone back their stuff,

10   the 150 million customers, I don't think that's our position.

11   I think the position would be to have some kind of process in

12   place where the owners who, perhaps like Mr. Goodwin, his

13   external hard drive crashes two days before Megaupload goes

14   down, someone like Mr. Goodwin can be in a position where he

15   files some sort of affidavit, some kind of sworn statement,

16   this is what I have, this is where you can find it, please

17   return it.  Not just a free-for-all.

18          But we have talked to a lot of people to have lost

19   their data over the course of this, and some of them had

20   back-ups, some of them cared more about their data than others

21   for a whole host of different reasons.  And kind of at least

22   give those folks an opportunity to get their stuff back.

23          I think those are very important property rights that

24   I am hoping that the parties will be able to take into account.

25          And I will just like to say one other quick thing.

1  And that is, as that process moves forward, one of the reasons

2  I am particularly glad to be here today is I think it's our

3  client and those who are similarly situated who face the

4  biggest risk of being ignored here.  So, I think I am really

5  glad, I am really happy to have the opportunity to be able to

6  talk on behalf of him and others like him.

7          THE COURT:  All right.  Thank you.

8          MS. SAMUELS:  Thank you.

9          THE COURT:  All right.

10          MR. BRINKMAN:  Your Honor, if you will hear from us,

11  Mr. Rothken will address this issue.

12          THE COURT:  Yes, I will hear from you.

13          MR. ROTHKEN:  Thank you, Your Honor.  Ira Rothken.

14  Thank you for allowing me to speak today.

15          THE COURT:  All right.

16          MR. ROTHKEN:  I appreciate it.

17          THE COURT:  And you are here representing Megaupload,

18  is that correct?

19          MR. ROTHKEN:  We are here, respectfully, if the Court

20  would allow us in a limited appearance to--

21          THE COURT:  I am going to allow you to appear

22  limited, for purposes of this hearing today on a limited basis.

23  I won't hold you in the case after today.

24          MR. ROTHKEN:  Thank you, Your Honor, we are grateful.

25          Your Honor, we have heard from a number of stake

1  holders, and Megaupload has listened to all their views.  And

2  while Megaupload firmly believes that it's a dual use

3  technology, that it's capable of substantial noninfringing

4  uses, and that ultimately it's going to prevail, it certainly

5  takes into account the pragmatic notion that there needs to be

6  a compromise.

7         And so, after listening to the MPAA, after listening

8  to Carpathia, after listening to EFF, and after listening to

9  the United States of America, and with the understanding that

10  there is a civil litigation pending where there is a need for

11  litigation hold, it seems like ultimately what should happen

12  here is that the parties should go back and meet and confer.

13  And maybe the meet and confer should be with a special master

14  who could parse out all these different issues, hopefully draw

15  a Venn diagram and figure out a holistic solution.

16         If you take a look at the file, a large number of

17  these issues were discussed, but they weren't discussed in a

18  way where there was robust interaction.  These issues were

19  raised.  I know that, for example, there is an e-mail in the

20  file where I wrote to the United States Attorney's Office

21  providing very strict conditions upon which Megaupload would

22  get the servers back.  In essence, limited to attorney's eyes

23  only or attorney access with licensed forensic examiners like

24  KPMG, and we would use it only in the cases with no consumer

25  access.

1          THE COURT:  KPMG has already been in to look at the

2     servers at Carpathia, or the portion that the Government had

3     already seized?

4          MR. ROTHKEN:  KPMG, due to their goodwill and due to

5     some begging by yours truly, decided that they would go ahead

6     on their dime, $30,000, to fly from California here to Virginia

7     to go to Carpathia and image two out of over 1,000 servers to

8     help us in our meet and confer.  And they did that.  I was able

9     to get the agreement of the United States Attorney's Office to

10    do that.

11         And so, we have analyzed those servers, and that's

12    helping us somewhat in this process.  And I can go into detail,

13    Your Honor, if you would like to hear why the rest of the

14    servers and all of them are highly relevant.

15         This is a dual use technology case.  Megaupload does

16    not believe that it's responsible for users' primary

17    infringements under the Sony doctrine, under the DMCA, even

18    under the willfulness standard under criminal law.

19         On those servers is evidence of automated processes,

20    software code and alleged content which would demonstrate, for

21    example, that files go through that system about 800 files a

22    second.  And that's the kind of evidence, Your Honor, that is

23    highly relevant for a jury to hear.  The human eye can't even

24    perceive 800 files per second.  That would obviously eviscerate

25    willfulness.

1          That evidence, the software code, the automated

2     systems, in the indictment there is an allegation related to

3     picking and choosing the most popular files and putting them on

4     specially high speed servers.  In the Internet industry, that

5     is known as caching, c-a-c-h-i-n-g.  The word "caching" does

6     not appear in the indictment.  Caching is a substantial

7     noninfringing use.  The evidence of that caching is on those

8     servers.

9          Caching is also covered by DMCA 512(b), and that

10    would be another basis for the defense.

11         But the list goes on and on and on, Your Honor, and

12    that is all macro evidence.  Micro evidence would include being

13    able to, for Megaupload to call specific users to the stand to

14    ask them how they use the services to show that it was a

15    legitimate cloud storage service.  To ask people like Mr.

16    Goodwin how he used it.  And to go ahead and pick and choose,

17    after getting access and after having the funds to be able to

18    do it, to ask people, did you store Microsoft word documents?

19    Did people in the military share photos with loved ones back

20    home?  It's even possible that the Department of Justice used

21    it, and under that would also show substantial noninfringing

22    uses.

23         So the macro evidence is important, the micro

24    evidence is important and it's highly relevant.

25         In terms of preservation, Your Honor.  The cost would

1　essentially be zero to preserve, and let me explain why.  This

2　is a multi--  This is a scaleable process.  The first thing was

3　that Carpathia and Mega cut a deal through counsel to sell the

4　servers for approximately $1.25 million, which was the cost of

5　the servers.  And that would only be payable after the entire

6　case was over.

7　　　　　So, essentially, it was a zero sum gain to the

8　estate.  And that would lead to, essentially, preservation

9　equals zero at that point.  Then, of course, there is going to

10　be costs with storing them some place that makes sense so that

11　they don't degrade, so that folks who ought to get access to

12　them can.  And there is going to be costs associated with that.

13　　　　　And then the next part about this, which goes in a

14　large part to EFF and to a certain part to litigants, is how do

15　you make these servers so that they go from not reasonably

16　accessible, which is what the diagram shows, to reasonably

17　accessible so that they are powered on so you could run

18　queries, so you could access them.

19　　　　　THE COURT:  So, this is essentially a contingency

20　arrangement where if Megaupload or the other defendants are

21　successful in freeing up money that's been already seized under

22　the criminal forfeiture statutes, then whoever is preserving

23　this evidence would be paid for it?

24　　　　　If, on the other hand, the Government is successful

25　in its theory of the case where they have had an indictment and

1    a superseding indictment, and their seizure theories include

2    multiple theories where the entire proceeds are forfeitable,

3    then either the preserver gets held holding the bag or the

4    Government has to ultimately free up money to pay whoever has

5    preserved the documents, is that where we are?  Is that what

6    you--

7           MR. ROTHKEN:  I would have to say generally speaking,

8    yes.  But any doubts regarding preservation ought to be

9    resolved in favor of preservation at this point.

10          THE COURT:  Who are you proposing be the preserver?

11          MR. ROTHKEN:  Your Honor, at this point, given the

12   diverging views on that, we are willing to meet and confer with

13   all the stake holders.  I think from Mega's perspective, its

14   preference under Brady and its progeny would be for the United

15   States to be the one who maintains and stores these servers.

16          But notwithstanding that, what's really going on

17   here, too, is a tension between an indictment, as Your Honor

18   mentioned, which is indicting all the revenues from the entire

19   site, and is breathtaking in scope, which then leads to, the

20   overbroad indictment leads to a very harsh economic cost on the

21   e-discovery issues in the case.  The broader the indictment,

22   the more costly the e-discovery issues.  And that's the honest

23   tension that is going on right here.

24          And meet and confer would certainly, just like one

25   would have in a civil case on e-discovery, I would suggest to

1   the Court that this case is begging for the same type of meet

2   and confer to happen here where the parties could sit down, get

3   a sense of what's fair under the circumstances, maybe even

4   await the results of a <u>Farmer</u> hearing because they may be

5   intertwined, if money could be freed up, and proceed in a very

6   cautious, you know, reasoned manner without there being any

7   kind of harsh destruction.

8        Because there would be no way to unring the bell if

9   the server data is lost.  And given the notion that the cost

10  for mere preservation even offline is relatively inexpensive,

11  and given what's at stake in this litigation, I would say to

12  Your Honor that all things unite to say that the data at least

13  for now should be preserved.

14       We would respectfully request that Your Honor order a

15  meet and confer with the assistance of a special master.  We

16  distill out the remaining issues for the Court.  And once they

17  are crystallized, we bring them back when they are ripe so the

18  Court can actually rule on discrete issues.

19       THE COURT:  All right.

20       MR. ROTHKEN:  Thank you.

21       THE COURT:  Thank you.  Yes, sir.

22       MR. HOLMES:  If I may heard just very briefly.

23       THE COURT:  Yes.

24       MR. HOLMES:  I do appreciate it, Your Honor.  Again,

25  Cliff Holmes on behalf of Microhits and co-plaintiff Valcom,

1    Incorporated.

2           We are late to this proceeding, Your Honor.  We

3    received notice of the emergency motion on April 6, and then

4    were successful in retaining a data forensic expert yesterday

5    and made our filing end of day yesterday, Your Honor.

6           We filed our civil complaint March 21.  It alleges

7    contributory copyright infringement, inducement of copyright

8    infringe, and unfair competition.  The status of that case is

9    that we've served one defendant, and we are waiting for the

10   proof of service to come back from Hong Kong.

11          We have an understanding that a second defendant

12   agreed to be served yesterday, and similarly we will await the

13   proof of service on that.

14          So, that case is just in the beginning stages.

15          What we submitted yesterday, Your Honor, was an

16   affidavit from our expert, Stevens Miller.  And where we were

17   coming at this was that we were hopeful that regardless of the

18   outcome of today's proceedings, is that we could reach an

19   assurance that at a minimum what is referred to as the server

20   log, which again is described in the affidavit, stores the

21   names and dates of access to material on the servers, could be

22   retained.

23          Now we understand that it is a somewhat more vexing

24   issue in the sense that as Carpathia represented, apparently

25   one has to go into the servers to attain a server log, at least

1  with respect to Megaupload data.

2           Again, with my own incipient understanding, being

3  informed by discussions with our expert yesterday, sounds to me

4  as though it may be a deviation from the industry norm.  We

5  understand that there are typically server logs maintained

6  independently.  So, we are disappointed to hear that, but it is

7  what it is.

8           We are certainly most open to any solution Your Honor

9  should devise, although we do respectfully put forth that

10  destruction as of today would be precipitous and would

11  potentially compromise the civil plaintiffs' interests in the

12  separate case.

13          THE COURT:  All right.  But your parties aren't

14  interested in taking custody of the data as well?

15          MR. HOLMES:  That's the question of the day, Your

16  Honor.  As others have similarly articulated, we are not in a

17  position to take possession at this juncture.

18          THE COURT:  All right, thank you.

19          MR. HOLMES:  All right.  Thank you, Your Honor.

20          MR. ZWILLINGER:  May I reply very briefly?

21          THE COURT:  Yes, sir.

22          MR. ZWILLINGER:  Just a couple of things that the

23  Government said I wanted to comment on.

24          The first was that they didn't seek to seize all

25  these servers.  The search warrant is under seal, but it has

 1   been alluded to, but they went before this very Court and asked

 2   for authority to seize all servers leased by Megaupload in this

 3   case.  And they chose not to exercise it, they came up with

 4   some other plan, but that is what they represented to the Court

 5   that they wanted authority to do.

 6          The second thing is that for the very reason the

 7   Government doesn't want it, it shows how unfair the burden is

 8   to place on Carpathia.  We are not a party to this proceeding.

 9   The Government says it is tens of million of dollars and that

10   we can apply to the Court for relief.  We just did, we have

11   applied to the Court for relief, and we ask that the Court find

12   a way to get us out of it.

13          The meet and confer suggested by Mr. Rothken, we have

14   met and conferred with everybody, and the Government said they

15   stopped being willing to talk about it once the MPAA filed a

16   preservation letter.  But we heard from the MPAA today that

17   their only concern is that it doesn't go back into the wild.

18   They don't actually seek preservation anymore, they say they

19   take no position with regard to destruction.

20          So, it doesn't seem like the MPAA's interest is a

21   reason to stop talking.

22          The final thing I just want to point out to the Court

23   is that we can't put Humpty Dumpty back together again in that

24   data center in Harrisonburg.  We don't have the networking

25   equipment, we don't have the ability.  This was in four data

1    centers across the country for a reason.

2           The servers are sitting there, but if they are going

3    to be energized, was the word, or allowed, only Mega can know

4    which servers to look at to find the stuff.  And Mega has been

5    very clear that they are willing to take it, they are willing

6    to take the servers and we are willing to forgo any payment

7    from them, at least until after the proceeding is over, or we

8    will just lend them servers for free if they promise to return

9    them when the case is over.

10          So, we don't need any payment to give it to Mega.

11   And I would ask that the Court fashion a remedy that either the

12   Government or Mega, the two parties to the case, take it with

13   whatever restrictions the Court believes are appropriate.

14          THE COURT:  Okay.  The server logs, you don't have

15   access to them, is that your position?

16          MR. ZWILLINGER:  That's right, Your Honor.  It

17   requires logical access to the data that is on the drives to

18   pull the logs out.  I believe Mega would be able to access the

19   server logs.  I believe the Government might be as well.

20          THE COURT:  But not in the present form of the hard

21   drives?

22          MR. ZWILLINGER:  They would have to be plugged in

23   and--  The hard drives can be staged, each server can be staged

24   in Harrisonburg on a one-server-at-a-time basis, plug in a

25   server, higher a forensic consultant, pull the server logs out.

1    I don't think the Government was quite necessarily

2    accurate that we could just do it because they did it, they

3    knew the passwords.  The Government's forensic experts must

4    have found a way to do it, but that would require an additional

5    cost.  We can't just do it, pull the server logs out, we can't

6    access the data ourselves.

7         THE COURT:  All right.  Thank you.

8         All right.  Well, I think the meet and confer is a

9    great idea.  And I am sure that the Government will participate

10   in the meet and confer and see if we can't work something out.

11        Judge Anderson is terrific at getting people to come

12   together and solve problems.  He does it on a daily basis.  And

13   I am going to have you call Judge Anderson and see when you can

14   get in to see him.

15        If you want to pay a special master, because I am not

16   going to pay one, but you have got Walt Kelley sitting in the

17   middle of the courtroom here who does that on a fairly regular

18   basis for a handsome sum of money, and he looks tanned and

19   rested and ready.  So, if Judge Anderson isn't the answer, then

20   I invite you to get a special master of your own choice.

21        Let's do that within the next two weeks and get your

22   calendars together.  I realize you probably all have electronic

23   calendars, and none of them found their way into the courtroom,

24   courthouse, but let's get together and see if you can't work it

25   out.

1    If not, let me know and I will make a decision, and

2  we will go from there.  That's as far as I think we are going

3  to go today in hearing any of the issues before me.

4    The appearance for a <u>Farmer</u> hearing, I am going to

5  put off for now.  I have got a couple issues, and I think there

6  is further briefing that is going to be necessary on that

7  because Megaupload is a separate entity and they haven't been

8  served.  And I have some, obviously some reservations in using

9  my resources, but also the Government resources at this stage.

10  As long as evidence is not being destroyed, I frankly don't

11  know that we are ever going to have a trial in this matter.

12  And the beginning, getting the train rolling down the hill at

13  this stage, I think is premature unless I am convinced

14  otherwise.  But we will save that for another day.

15    All right.  All right.  Thank you all.  I appreciate

16  the briefing.  And you see how far you can get, and hopefully I

17  will get a good report.

18    Have a good weekend everybody.  Thank you.

19  -------------------------------------------------

             HEARING CONCLUDED

20

21

     I certify that the foregoing is a true and

22
   accurate transcription of my stenographic notes.

23

24
        /s/  Norman B. Linnell
25       Norman B. Linnell, RPR, CM, VCE, FCRR