**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *et al.*, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | The Honorable Liam O'Grady |
| | ) | |
| KIM DOTCOM, *et al.*, | ) | 1:12-cr-00003-LO |
| | ) | |
| | ) | |
| Defendants. | ) | |

**QTS'S RESPONSE TO THE COURT'S OCTOBER 29, 2015 ORDER**

Pursuant to this Court's October 29, 2015, Order (Dkt. No. 229), QTS Realty Trust, Inc. and Carpathia Hosting, Inc. (together "QTS") provide the following responses:

2. Do QTS and/or Carpathia Hosting, Inc. believe the data is recoverable given the time that has passed and the condition in which the servers have been stored?

**QTS's Response**: QTS has never had access to the data on the MegaUpload servers. QTS owns the servers on which the data resides. Therefore, QTS is not in the best position to judge whether the data is recoverable, as the way in which the servers were configured and data was organized will have an impact on whether, and to what extent, data will be recoverable. Based on QTS's experience in the data center industry, however, it is QTS's opinion that there is a high likelihood that the disk drives, on which the data presumably reside, will experience high failure rates. Depending on how the data was organized by the MegaUpload applications, such failures may substantially impact the recoverability of the data. Moreover, around the time that the government seized the servers pursuant to search warrant, the servers were experiencing hard drive failures at a rate higher than the historical average. Also, when the government seized the

servers, the servers were not shut down according to industry-standard procedures, which will increase the likelihood of data integrity issues. As this Court knows from Carpathia's previous filings and letters, the servers have been sitting idle for nearly four years in various environments – for several months in their initial location in an Equinix data facility, for approximately a year in Carpathia's datacenter (powered down and not networked), and now for approximately 2 ½ years in a secured and conditioned JK storage facility (again, powered down and not networked).

8. To all parties, what are the costs associated with activating the computer servers, searching for the data of innocent third parties, and retrieving and returning the same?

**QTS's Response:** Because QTS does not and never has had access to the data on the servers, QTS can only provide an estimate of the cost to transfer, set up and house the servers in a data center. Servers such as those at issue must be operated in a data center that carefully monitors and controls environmental and power conditions; the servers cannot be powered up in the current JK storage facility and be expected to operate reliably. QTS believes it would cost approximately $65,000 to physically transfer all of the servers to a data center location.

Once at a data center, QTS believes it would cost approximately $233,000 in labor and materials to physically rack the servers and connect them to suitable electrical power. Once electrical power was delivered to all the servers, QTS estimates that a reasonable 'market rate' for the data center space and power consumption is $238,000 per month.

Moreover, when used by MegaUpload, the servers were operating in an interconnected manner through the use of sophisticated networking equipment – all of which has been disconnected and repurposed or retired. The servers would need replacement networking equipment to interconnect the machines again and to connect the machines to the internet, if that is deemed necessary. The type of networking equipment that was in use at the time the

government seized the servers is no longer available in the retail marketplace.  QTS estimates, using historical information from early 2012, that if used networking equipment were available, the reasonable market price for such equipment would be approximately $500,000.  QTS has an insufficient understanding of how the MegaUpload application functioned to determine whether currently available new networking equipment could be used to replicate the functionality of the original networking equipment.

     Finally, these estimates do not include any costs associated with internet connectivity to facilitate delivering any data to innocent third-party owners, nor any replacement equipment costs, such as replacing failed hard drives.

Dated:  November 12, 2015                    Respectfully submitted,

                                          */s/ Jonathan S. Frankel*
                                          Jonathan S. Frankel
                                          ZWILLGEN PLLC
                                          1900 M Street NW, Suite 250
                                          Washington, DC 20036
                                          Tel: (202) 296-3585
                                          Fax: (202) 706-5298
                                          jon@zwillgen.com

                                          Robert F. Huff Jr. (*Pro Hac Vice*)
                                          ZWILLGEN PLLC
                                          300 N LaSalle St., Ste 4925
                                          Chicago, IL 60654
                                          Tel: (312) 685-2278
                                          bart@zwillgen.com

                                          *Counsel for QTS Realty Trust, Inc. and Carpathia Hosting, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 12, 2015 I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send a notification of such filing (NEF) to all counsel of record.

*/s/ Jonathan S. Frankel*
Jonathan S. Frankel