IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>KIM DOTCOM, et al., )<br>)<br>Defendants )<br>) | The Honorable Liam O'Grady<br><br>Criminal No. 1:12-CR-3 |

**DEFENDANT MEGAUPLOAD LIMITED'S RESPONSES
TO THE COURT'S OCTOBER 29, 2015 QUESTIONS**

Pursuant to the Court's Order of October 29, 2015 (Dkt. 229) allowing undersigned counsel "to enter a limited and special appearance for the purpose of filing a response to the Court's order," which order directs the interested parties to respond to nine questions related to the Renewed Motion for Protective Order filed by QTS Realty Trust, Inc. (Dkt. 217), counsel for Megaupload Limited ("Megaupload") respond as follows:

**Question 1.   Does counsel for Megaupload Limited ("Megaupload") still request receipt of the seized data stored on the hard drives of the computer servers owned by QTS (successor-in-interest to Carpathia Hosting, Inc.)?**

MEGAUPLOAD'S RESPONSE:  Yes—*provided that*, funding to secure, restore, and host the data, as well as for payment to coordinating attorneys, eDiscovery vendors, and technology consultants, is made available from the government or assets seized and subject the Court's forfeiture order in the parallel civil asset forfeiture action, *United States v. All Assets, etc.*, No. 1:14cv969-LO-MSN (E.D. Va. Apr. 14, 2015) (Dkt. 112, separate final judgment as to certain assets), *appeal docketed sub nom. United States v. Finn Batato, et al.*, No. 1:15-1360 (4th Cir. docketed Apr. 8, 2015).  Having had those assets forfeited and all other assets having been

seized here or in foreign countries, Megaupload now has no unrestrained assets, and so would need to have seized assets unfrozen, liquidated, and used to secure, restore, and recover the data.

In 2012, Megaupload and Carpathia had reached an agreement for Megaupload to purchase the servers from Carpathia for $1,465,500, with payment deferred until final disposition of the criminal case against Megaupload. (*see* Dkt. 67, Exhibit C, ¶¶ 1.3, 1.4.) That agreement would have given defense counsel inexpensive and reasonable access to the data to use as evidence, which would have substantially ameliorated the evidentiary and due process issues in both the civil and criminal cases. As stated by Carpathia, the agreement was: "a much less expensive alternative than Mega making its own image of the servers. ... The government objected to that sale, apparently for the reasons described in its response brief: 'The government ... is additionally concerned because it has not seen any detailed plans for appropriately transferring the Carpathia Servers to an entity that demonstrates reasonable and untainted resources for that purpose, provides sufficient safeguards regarding access, successfully deals with the specific concerns of victims, and deals appropriately with the contraband and other illegitimate files on the Carpathia Servers.' (Govt Br. at n. 3). " (Dkt. 70 at 7-8, quoting from Dkt. 56.)

It is respectfully submitted that the Government's stated concerns about safeguards, etc., were not based on fact. Contrary to the Government objections, Megaupload wanted the servers to be preserved "under a litigation hold." Defense counsel and consultants would have "exclusive access to the Mega data hosted on the Mega servers" and "[a]ll uses of the data . . . [would] be for purposes of assisting Mega and co-defendants in criminal or civil litigation." Defendants proposed that "consumer access to server content shall be prohibited and allowed only on such terms as shall be ordered by a UnitedStates District Court or agreed to in writing

- 3 -

signed by the US Attorney's Office," and that "No electronically stored materials may be materially altered, wiped, deleted, or destroyed in any manner." (Dkt. 67, Exhibit D.)

The data would likely need to be restored and mirrored before it can be used for consumer access or electronic discovery. Megaupload had previously received an e-vendor's estimate of US$7.7 million for forensic duplication of the data needed for e-discovery and evidence purposes.

> **Question 2.  Do QTS and/or Carpathia Hosting, Inc. believe the data is recoverable given the time that has passed and the condition in which the servers have been stored?**

MEGAUPLOAD'S RESPONSE:  This question is directed to **QTS or Carpathia Hosting, Inc**., or both, who would have the best information.  There are reasonable grounds to believe that a substantial amount of data can still be restored and recovered, although risks of degradation and data loss increase with time.  Moreover, fundemenal fairness dictates that reasonable efforts now be made to recover and preserve the data, which is material evidence in both criminal and civil cases.  Proof of the charges in the criminal case, including conspiracy to commit such crimes, must identify specific copyrighted works on a work-by-work, link-by-link basis, and describe the who, what, when, where, why, and how elements for each such instance, and to examine fair use, among other things.  Preserving this data as evidence, and allowing defense counsel access to it, therefore, is a necessary step to finding the truth in these cases.

> **Question 3.  If the data is transferred to counsel for Megaupload, how would counsel preserve the data?**

MEGAUPLOAD'S RESPONSE: Based on the availability of funds, as noted in response to Question 1, counsel for Megaupload anticipates data would be handled by a reputable eDiscovery vendor, such as KPMG, consistent with the terms of an appropriate order governing the transfer, recovery, restoration, and preservation of the data.  It is expected that the vendor

would first make a forensic duplicate of the data on a stable medium for preservation and future litigation use.

> **Question 4. If the data is transferred to counsel for Megaupload, how would counsel protect the confidentiality of its contents and prevent its release or transfer to third parties?**

MEGAUPLOAD'S RESPONSE: Counsel for Megaupload expects that there will be an order in place (like a source code protective order) restricting the parties and counsel's access, and precluding any transfers except with Court approval. The privacy rights of consumers ought to be included in any data access order.

> **Question 5. Is it the position of the United States that it has no interest in possessing or preserving the data stored on the hard drives of the QTS computer servers?**

MEGAUPLOAD'S RESPONSE: This question is directed to the United States, and Megaupload does not make a response.

> **Question 6. How much money, if any, is Megaupload willing to pay to obtain the computer servers from QTS?**

MEGAUPLOAD'S RESPONSE: As explained in its Response to Question 1 Megaupload has no unrestrained funds at this time. However, also as indicated above, Megaupload had previously negotiated a no-money-down purchase agreement with Carpathia that was blocked by the government.

> **Question 7. Do the members of the Motion Picture Association of America remain concerned about the potential release of copyrighted works and/or the potential financial harm from such a release? If so, what value do they place on the copyrighted material (taking into account the passage of three years)?**

MEGAUPLOAD'S RESPONSE: This question is directed to other parties, and Megaupload does not make a response.

**Question 8.** **To all parties, what are the costs associated with activating the computer servers, searching for the data of innocent third parties, and retrieving and returning the same?**

MEGAUPLOAD'S RESPONSE: As noted above, the cost for the initial phase of activation of the computer servers for forensic copying to preserve the integrity of the data as evidence, was estimated (in 2012) at approximately US$7.7 million. Megaupload has not obtained an estimate from an eDiscovery vendor for the costs to search, retrieve, and return data to innocent third parties. Counsel for Megaupload, however, suggests that a protocol for searching, retrieval, and return of data may be devised, after the server data has been properly copied and preserved for evidentiary purposes. As noted above, however, Megaupload has no unrestrained funds for that task and any such order will need to include funding. Furthermore, as stated in defendants' previously filed *Farmer* motions (*e.g.*, Dkt. 190), an allocation for reasonable attorney's fees for defense counsel to assist in such matters also is needed.

The return of data to "innocent third parties" also implicates other technical, economic, and legal issues, such as controlling who will qualify for gaining access, and how the hosting and bandwidth will be provided for, among other things. Limitations on liability will need to be included in any order.

**Question 9.** **How do the parties propose to notify innocent third parties that the servers are available to be searched and their data retrieved?**

MEGAUPLOAD'S RESPONSE: To the extent contact information of former Megaupload users is contained in the server data, email notice could go out to identifiable users. In addition, an agreed upon announcement could be published in prominent digital media. An informational webpage, similar to a class action settlement, also could be set up to advise users of procedures and status of data availability.

- 6 -

Respectfully submitted,

/s/ Craig C. Reilly
Craig C. Reilly
VSB # 20942
111 Oronoco Street
Alexandria, Virginia 22314
TEL (703) 549-5354
FAX (703) 549-5355
Craig.reilly@ccreillylaw.com

Ira P. Rothken (pro hac vice)
Jared R. Smith (pro hac vice)
ROTHKEN LAW FIRM
3 Hamilton Landing
Suite 280
Novato, CA 94949
(415) 924-4250
(415) 924-2905 (fax)
ira@techfirm.net
*Counsel for Defendant Megaupload Limited*

## CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2015, the foregoing was filed and served electronically by the Court's CM/ECF system upon all registered users.

/s/ Craig C. Reilly
Craig C. Reilly
VSB # 20942
111 Oronoco Street
Alexandria, Virginia 22314
TEL (703) 549-5354
FAX (703) 549-5355
Craig.reilly@ccreillylaw.com
*Counsel for Defendant Megaupload Ltd.*